Jimmy D. EAKLE, Plaintiff,

v.

GRINNELL CORPORATION, Defendant.

No. CIV–02–568–S.

United States District Court, E.D. Oklahoma.

June 11, 2003.

---

## ORDER

SEAY, District Judge.

Plaintiff Jimmy D. Eakle ("Eakle") brings this declaratory judgment action against Defendant Grinnell Corporation ("Grinnell") seeking to have the court declare the parties' Non–Compete Agreement ("NCA") invalid and unenforceable under Oklahoma law. The parties have filed their respective motions for summary judgment and the matter is ripe for determination. Having fully reviewed the respective submissions, the court concludes the NCA is valid and enforceable; consequently, Eakle's motion for summary judgment should be denied and Grinnell's motion for summary judgment should be granted.

## I. *Background*

Prior to May 30, 2000, Eakle was the President and sole shareholder of Advanced Communication Systems, Inc. ("ACS"), a company which was engaged in the business of selling, installing, and servicing electronic security and alarm systems. ACS was headquartered in Pocola, Oklahoma, and conducted its business activities primarily in Arkansas and Oklahoma. Through his ownership of ACS and his prior employment history, Eakle had acquired considerable experience and expertise in the security industry and he had cultivated substantial client and industry contacts in the Arkansas/Oklahoma region.

On May 31, 2000, Eakle and Grinnell entered into a Stock Purchase Agreement ("Agreement") whereby Grinnell purchased all shares of the outstanding cápital stock of ACS from Eakle. Agreement, § 1.1.[1] The initial purchase price was $550,000. *Id.* at § 2.1(a). The Agreement also provided that Eakle was entitled to two additional $50,000 payments, due on the first and second anniversary dates of the May 31, 2000, Closing Date, unless Eakle voluntarily left the employ of Grinnell or was terminated for defined cause. *Id.* at § 2.1(b).[2] As part of this stock transaction, Eakle executed the NCA. *Id.* at § 5.7. Under the terms of the NCA, Eakle agreed that for a period of five years from the Closing Date he would not undertake certain activity which would compete against or devalue the business acquired by Grinnell within the defined Territory[3]. As set forth in paragraph four of the NCA, Eakle agreed to the following:

As an inducement for Purchaser to enter into the Stock Purchase Agreement and as additional consideration for the consideration to be paid to Shareholder under the Stock Purchase Agreement, Shareholder agrees that:

(a) For a period of five (5) years after the Closing:

(i) Shareholder will not, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend Shareholder's name or any similar name to, lend Shareholder's credit to, or render services or advice to, any business whose products or activities compete in whole or in part with the products or activities of the Company, anywhere within the Territory; provided, however, that Shareholder may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934. Shareholder agrees that this covenant is reasonable with respect to its duration, geographical area, and scope.

(ii) Shareholder will not, directly or indirectly, either for himself or any other Person, (A) induce or attempt to induce any employee of the Company

---

1. On Eakle's behalf, the Agreement and NCA were negotiated with the assistance of his attorney, Stan Holliman.

2. The $650,000 purchase price is set against a backdrop of net assets of ACS in the amount of $462,992.00, consisting of $437,823.00 in

accounts receivable, $53,159.00 in inventory, $247,858.00 in other assets, and $275,848.00 in total liabilities.

3. Paragraph two of the NCA defines "Territory" as the "States of Arkansas and Oklahoma."

to leave the employ of the Company, (B) in any way interfere with the relationship between the Company and any employee of the Company, (C) employ, or otherwise engage as an employee, independent contractor, or otherwise, any employee of the Company, or (D) induce or attempt to induce any customer, supplier, licensee, or business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any customer, supplier, licensee, or business relation of the Company.

(iii) Shareholder will not, directly or indirectly, either for himself or any other Person, solicit business of any Person known to Shareholder to be a customer of the Company, whether or not Shareholder had personal contact with such Person, with respect to products or activities which compete in whole or in part with the products or activities of the Company.

(b) In the event of a breach by Shareholder of any covenant set forth in Subsection 4(a) of this Agreement, the term of such covenant will be extended by the period of the duration of such breach;

(c) Shareholder will not, at any time during or after the five year period, disparage Purchaser of the Company, or any of their shareholders, directors, officers, employees, or agents.

Both the Agreement and the NCA provide that the law of the State of Delaware is the governing law. Agreement, § 10.7 and NCA, § 8.

Following the execution of the Agreement and the NCA in May 2000, Eakle became employed by Grinnell and continued to work for them in Arkansas and Oklahoma until his termination in June 2002. Eakle was terminated after receiving the two additional $50,000 payments

under the Agreement. Eakle thereafter filed an action in the District Court of Haskell County, Oklahoma, seeking a declaratory judgment that the NCA was not enforceable. Grinnell removed the state court action to this court on the basis of diversity jurisdiction and seeks to have the NCA enforced in its entirety.

Although he recognizes the inclusion of the Delaware choice-of-law provision in the NCA, Eakle asserts Delaware law cannot apply because enforcement of the NCA under Delaware law would violate the fundamental public policies of the State of Oklahoma. In this regard, Eakle contends the NCA is unenforceable by arguing that Oklahoma law limits non-competition agreements between employees and employers to the prohibition of the active solicitation of business from the established customers of the former employer. Furthermore, even if the court were to find that this case involved the sale of goodwill, Eakle contends Oklahoma law would only permit the enforcement of the NCA with respect to the operation of a competing business in Leflore County, Oklahoma (the location of Pocola, Oklahoma) and the counties contiguous thereto. Eakle nonetheless objects to any reformation of the NCA with regard to its geographical scope because the NCA is otherwise inconsistent with Oklahoma public policy as to its duration and the activities covered. Finally, Eakle argues that even if the court were to find the NCA enforceable, principles of equity dictate its nonenforcement due to the fact that he did not receive the consideration promised him in the form of continued employment with Grinnell.

Grinnell contends Delaware clearly applies as the chosen law under the explicit terms of the NCA. Grinnell further argues that even if Oklahoma law were to apply, the NCA would be enforceable. As to

Eakle's equity argument, Grinnell claims the evidence fails to establish any promise of continued employment on its part and, moreover, that the terms of the NCA provide that the parties' entire agreement is reflected in that written document and no oral representations can operate to amend its provisions.

## II. Choice-of-Law

In a diversity action such as the instant case, the court is required to apply the law of the forum state including its choice of law rules. *Moore v. Subaru of America,* 891 F.2d 1445, 1448 (10th Cir. 1989). With respect to contract actions, the general rule under Oklahoma law is that "a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought." *Williams v. Shearson Lehman Brothers, Inc.,* 917 P.2d 998, 1002 (Okla.Ct.App.1996). Thus, the parties to a contract "are free to specify by contract the rules under which [the contract will be enforced], including the specification of the law of a particular jurisdiction." *Id.* As this general rule recognizes, however, the forum court will not apply the law chosen by the contracting parties should doing so violate the public policy of the forum state. *Moore,* 891 F.2d at 1448–50. In this case, the court must therefore determine whether application of Delaware law as chosen by the parties violates the public policy of Oklahoma. To do so, the court will identify the conflict between Delaware and Oklahoma law with respect to non-compete agreements and the settled public policy of Oklahoma law applicable to such agreements.

## III. Delaware Law

Covenants not to compete in connection with the sale of businesses have been upheld under Delaware law. In *Turek v. Tull,* 139 A.2d 368 (Del.Ch.1958), *aff'd,* 147 A.2d 658 (Del.1958), the Delaware Chancery court set forth the standard for evaluating the validity of non-compete agreements:

> It is established, however, that in the sale of a business and its good will, a promise by the seller not to compete will be enforced if reasonably limited as to time, area and purpose and if such promise does not constitute an unreasonable restraint of trade or otherwise contravene public policy. Or, as has been stated, if at the time of the sale of a business a covenant not to compete is no broader than is necessary for the adequate protection of the buyer and does not tend to create a monopoly, it is generally valid, . . . .

*Id.* at 372 (citation omitted); *see also Research & Trading Corporation v. Pfuhl,* 1992 WL 345465 *6 (Del.Ch.1992). Eakle does not dispute Delaware's recognition of non-compete agreements which conform to this standard.[4]

A review of the NCA under this standard reveals that it is valid under Delaware law. The NCA has a stated term of five years from the Closing Date of May 30, 2000. Given Eakle's two-year employment with Grinnell, however, the effective term of the NCA is actually three years from the date of his termination. Regardless of whether the NCA is interpreted as five-years or three-years in duration, the court concludes it is reasonably limited temporally. *See Turek,* 139 A.2d at 372 (enforcement of a ten-year covenant not to

**4.** As noted above, rather than attacking the validity of the NCA under Delaware law, Eakle implicitly admits that Delaware courts would uphold the validity of the NCA, but that it nonetheless should not be enforced as such an agreement is forbidden under Oklahoma law.

compete in connection with sale of sanitarium). Under the circumstances, such a term provides a reasonable time frame for the protection of Grinnell's interests and the preservation and development of the goodwill it acquired by purchasing ACS.

The NCA is also reasonable as far as its geographic coverage. Under the terms of the NCA, Eakle is prohibited from engaging in certain activities within the states of Arkansas and Oklahoma. It is undisputed that ACS marketed and sold its services throughout the Arkansas/Oklahoma region.[5] Given Eakle's concentration of efforts in the Arkansas/Oklahoma region, it is not unreasonable to extend Grinnell's protection to that market. Delaware courts have addressed the geographic scope of non-compete agreements as follows:

> While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection. If this market, or more accurately, the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market, then it is appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location.

*Pfuhl,* 1992 WL 345465, *12. As Grinnell purchased a company (and its goodwill) with extensive market connections in the Arkansas/Oklahoma region, Delaware law

counsels that it would not be unreasonable to enforce the parties' non-competition agreement in that market.

Finally, the court concludes the purpose and operation of the NCA reasonably protect the legitimate interests of Grinnell without creating a monopoly in the marketplace. Delaware law recognizes that "[a] non-competition agreement will only be enforced to protect the legitimate economic interests of the employer." *Pfuhl,* 1992 WL 345465, *12. In this case, Grinnell has legitimate economic interests it seeks to protect through the enforcement of the NCA. Under the terms of the NCA, Eakle is prohibited from engaging in certain activities—(1) financial, management, or employment connections with competing businesses, (2) interference with existing employees or customers of Grinnell, and (3) solicitation of Grinnell's customers. These prohibitions, while broad, are intended to protect the legitimate economic interests of Grinnell in preserving the value and goodwill of its investment, as well as the retention of its employees and customers free from improper influence by Eakle. These prohibitions provide Grinnell with the opportunity to develop its investment, including ACS's employees and customers, without the fear of Eakle taking action which would cause a depreciation of the company's value. In exchange for these restrictions on his activities postacquisition of ACS, Eakle was paid the considerable sum of $650,000. Under these circumstances, the court concludes the purpose and operation of the NCA are reasonable.[6]

In light of this analysis, the court concludes the scope and terms of the NCA are valid and enforceable under Delaware law.

---

5. In the past, ACS conducted business in states other than Arkansas and Oklahoma. The NCA does not preclude Eakle from engaging in business activities outside the Arkansas/Oklahoma region.

6. There is no evidence in the record to suggest the enforcement of the NCA would somehow create a monopoly in the relevant marketplace of the security industry.

## IV. *Public Policy of Oklahoma*

Under Oklahoma law, non-competition agreements are generally void as against public policy, subject to statutorily created exceptions. *Bayly, Martin & Fay, Inc. v. Pickard,* 780 P.2d 1168, 1170 (Okla.1989). In this regard, 15 O.S. § 217 provides:

> Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section of this act, is to that extent void.

The exceptions set forth under section 217 involve the sale of goodwill (section 218), the dissolution of a partnership (section 219), and non-competition agreements in the context of the termination of an employment relationship (section 219A). As this case does not involve the dissolution of a partnership, the relevant exceptions to be discussed are sections 218 and 219A.

■ Initially, it is argued by Eakle that the NCA violates section 219A because of its duration, geographic restriction, and overall comprehensive nature of the prohibited activities. Eakle accurately points out that section 219A permits employees to enter into non-compete agreements with employers, but only to the extent "the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer." 15 O.S. § 219A(A). Otherwise, the employee is "permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer." *Id.* Admittedly, the NCA goes beyond section 219A(A)'s specific prohibition against the active solicitation of established customers by, among other things, precluding Eakle from owning, operating, or being employed by any similar business in competition with Grinnell.

Notwithstanding the NCA's conflict with the limited prohibition allowed by section 219A(A), the court finds section 219A(A) does not operate to render the NCA invalid and unenforceable for the reason that section 219A(A), which became effective June 4, 2001, is not applicable to the court's assessment of the NCA, entered into on May 31, 2000. Given the absence of any legislative provision dictating the retroactive application of section 219A(A), and the presumption that parties contract with reference to the applicable law at the time of the contract, the court concludes section 219A(A) should only be applied to contracts entered into on or after the June 4, 2001, effective date. *See McKinley v. Prudential Property and Cas. Ins.,* 619 P.2d 1269, 1270 (Okla.Ct.App.1980). As Eakle and Grinnell executed the NCA on May 31, 2000, section 219A(A) has no application with respect to the court's analysis of the public policy of Oklahoma in the context of non-compete agreements such as the NCA.

The operative exception embodying Oklahoma public policy on the issue of non-compete agreements can be found in section 218, which provides:

> One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof, so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein. Provided, that any such agreement which is otherwise lawful but which exceeds the territorial limitations specified by this section may be deemed valid, but only within the county comprising the primary place of the conduct of the subject business and within any counties contiguous thereto.

Thus, section 218 allows a party selling the goodwill of his business "to agree not to compete within a specified county or city for as long as the purchaser carries on a similar business." *Bayly, Martin & Fay*, 780 P.2d at 1173 n. 11. The Oklahoma Supreme Court has held that non-compete agreements in connection with the sale of goodwill, which are otherwise valid, are subject to modification with respect to the territorial restrictions found in section 218. *See Hartman v. Everett*, 158 Okla. 29, 12 P.2d 543, 544 (1932) (non-compete agreement restricting seller from engaging in business in United States for five years void only to extent prohibition goes beyond specific county of operation). Moreover, the Court has approved non-compete agreements under section 218 with five-year terms. *Id.* and *Herrington*, 74 P.2d at 391 (five years).

■ Eakle argues that section 218 is not applicable because this case does not involve the sale of goodwill, but rather, involves the enforcement of a non-compete agreement between an employer and an employee—a situation governed by section 219A(A). The court disagrees for two reasons. First, the court has determined that the effective date of section 219A(A) precludes its application herein. Second, the court finds the Agreement and the NCA clearly contemplate the sale of ACS's goodwill to Grinnell, which purchased 100% of the stock of ACS. By itself, this stock purchase is evidence of the sale of goodwill. *See Key v. Perkins*, 173 Okla. 99, 46 P.2d 530, 532 (1935) (sale of 20% of stock could constitute sale of goodwill within meaning of section 218). Moreover, the provisions of the NCA prohibiting Eakle from engaging in certain activities are clearly directed to the preservation of goodwill for the benefit of Grinnell. Oklahoma case law has defined "goodwill" as:

"the custom or patronage of an established trade or business; the benefit or advantage of having established a business and secured its patronage by the public. See Black's Law Dictionary, Third Edition. The 'good will' value of any business is the value that results from the probability that old customers will continue to trade with an established concern." *Freeling v. Wood*, 361 P.2d 1061 (Okla.1961).

The sale of ACS unquestionably involved the transfer of its entire asset base to Grinnell, including the goodwill it developed during the course of its operations. The mere fact that the term "goodwill" is not listed in either the Agreement or the NCA does not equate with a finding that goodwill was not transferred. *See Herrington v. Hackler*, 181 Okla. 396, 74 P.2d 388, 391 (1937) ("Where a contract for the sale and transfer of a business omits to mention the goodwill, the presumption is that it was the intention of the parties that the goodwill should pass with the other assets. This necessarily results from the fact that the goodwill cannot exist except in connection with the business.").

■ It is Eakle's position that, assuming the application of section 218 in the context of evaluating Oklahoma's public policy, the NCA violates the fundamental public policies of the state of Oklahoma as embodied in section 218 because it goes beyond prohibiting him from carrying on a similar business within a specified county or city and because it contains a five-year term. As to the duration of the NCA, Eakle's argument is foreclosed by *Hartman* and *Herrington*, both of which approved of five-year non-compete agreements under a section 218 analysis. With respect to the territorial restrictions contained in the NCA, the court agrees with Eakle that section 218 would preclude the enforcement of the NCA in the Arkansas/Oklahoma region and that a modification consistent with section 218 would limit enforcement to a particular county (presumably LeFlore County, Oklahoma—the

site of Pocola, Oklahoma) and those contiguous thereto. As to the breadth of the prohibitions imposed on Eakle, the court concludes the restrictions under the NCA, i.e. ownership in similar business, interference with customers and employees, and solicitation of business, are within the meaning of "carrying on a similar business" set forth under section 218. As stated by the Oklahoma Supreme Court, "the purpose of this statute [section 218] is to allow the parties to the transfer of a going business to mutually agree, as part of the value of the business transferred, that the transferee will be protected from his transferor who might use his previously acquired experience, contacts and expertise to promote his own interests in the same field of business in competition with his transferee." *Farren v. Autoviable Serv., Inc.*, 508 P.2d 646, 648 (Okla.1973). The prohibitions listed in the NCA clearly promote this purpose of protecting Grinnell by prohibiting Eakle from using his experience, contacts, and expertise to his advantage in competition with Grinnell. These type of restrictions are therefore reasonably within the ambit of section 218's coverage of "carrying on a similar business."

■ This analysis of section 218 in the context of the NCA reveals a conflict only with respect to the territorial restrictions imposed on Eakle. Under the NCA, as enforced under Delaware law, Eakle is prohibited from certain activities in the Arkansas/Oklahoma region; under section 218, the prohibition would extend only to Leflore County, Oklahoma, and those counties contiguous thereto. Eakle would have this court invalidate the NCA based on this difference. The court declines to do so. A mere difference in the law is not sufficient to warrant the application of the public policy exception argued for by Ea-

kle. *See Mirville v. Mirville*, 10 Fed. Appx. 640 (10th Cir.2001) (a mere difference in the law does not warrant the application of the public policy exception to Kansas's *lex loci contractus* rule). To hold otherwise would be to allow the exception to swallow the rule. If the court were to follow Eakle's line of reasoning then the forum's law would always apply when a difference in respective states' laws could be shown. The mere fact a chosen law differs from the forum's law does not make the application of the chosen law a violation of the forum's public policy. Rather, a broader concept of public policy is required. Here, the public policy of Oklahoma authorizes non-compete agreements in the context of the sale of goodwill. While it is true that certain limitations have been enacted under section 218 to govern these situations, the fact remains that Oklahoma nonetheless approves of the concept of non-compete agreements when the sale of goodwill is involved, albeit with certain geographic restrictions. The court concludes such restrictions do not act as an impediment to its application of Delaware law in connection with the NCA.

## V. *Equitable Considerations*

Finally, Eakle asserts equity will not permit the court to enforce the NCA because he did not receive consideration in the form of five years of employment with Grinnell. Eakle argues he was induced into entering the NCA by a promise of continued employment throughout the term of the NCA and that Grinnell's failure to assure this consideration warrants the application of equitable principles to invalidate the NCA. The court rejects this argument. The record does not substantiate any promise of continued employment. Neither the Agreement nor the NCA refer to any specific term of employment.[7] Ea-

---

**7.** The Agreement does make reference to a two-year employment period for Eakle by

conditioning the two yearly $50,000 payments on Eakle not voluntarily leaving the employ of

kle attempts to insert a five-year term by virtue of an alleged oral promise of employment. Such an attempt, however, is foreclosed by the language of the sale documents. Both the Agreement and the NCA contain language to the effect that these documents are the parties' entire agreement and that they superseded any prior written and oral agreements. Agreement, § 10.4 and NCA § 13. Moreover, a review of Eakle's deposition testimony discloses only his "belief" that he would be employed throughout the term of the NCA—not any promise by Grinnell to that effect. Eakle Deposition, p. 141:13–145:5. Consequently, Eakle's attempt to invoke equity to overturn the enforcement of the NCA must be rejected.

## VI. *Conclusion*

After much negotiation and with the assistance of counsel, Eakle executed documents transferring his company, ACS, and its goodwill to Grinnell for $650,000. As part of this transaction, Eakle executed a non-compete agreement whereby he agreed to certain restrictions on his future activities for a five-year period in the Arkansas/Oklahoma region. Eakle also agreed to the application of Delaware law in regards to the interpretation and enforcement of the agreement. These restrictions were designed to afford Grinnell the opportunity to develop its acquired business free from competitive activities on the part of Eakle in the territorial market formerly canvassed by ACS. This type of non-compete agreement, as to duration, territory, and scope, is authorized by Delaware law and does not violate the public policy of Oklahoma law. The court therefore upholds the validity of the NCA and rejects Eakle's request for declaratory relief.

Grinnell and not being terminated for cause prior to May 31, 2002, the two-year anniver-

Based on the foregoing reasons, Eakle's motion for summary judgment is denied and Grinnell's counter-motion for summary judgment is granted.

sary of the date of the Agreement.