**Opinion issued April 4, 2013**



In The

# Court of Appeals

For The

# First District of Texas

——————————

## NO. 01-12-00431-CV

——————————

**SPEEDEMISSIONS, INC., Appellant**

**V.**

**BEAR GATE, L.P. AND SPENCER HEAD, LLC, Appellees**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-23,390**

---

## O P I N I O N

Appellant, Speedemissions, Inc., filed suit for a declaratory judgment construing the agreements between itself and appellees, Bear Gate, L.P. and Spencer Head, LLC (collectively, "Bear Gate"). Speedemissions alleged that Bear Gate was obligated to submit to arbitration on Speedemissions' claims of breach of

contract and conversion, and it moved the trial court to compel arbitration. In its sole issue, Speedemissions argues that the trial court erred in denying its motion to compel arbitration.

We affirm.

## Background

Speedemissions is a publicly-traded company that owns and operates forty vehicle emissions and safety inspection stations in several different states, including Texas. In 2005, Speedemissions sought to purchase Mr. Sticker, Inc., a Texas corporation that operated six vehicle inspection stations in Houston, Texas. David and Barbara Smith and their son, Grant Smith (collectively, "the Smiths"), owned Mr. Sticker. Mr. Sticker owned the real estate for two of its locations ("the Properties"), and it leased the remaining four premises from third parties.

In the course of negotiations over the purchase of Mr. Sticker, Speedemissions indicated that it was not interested in purchasing the real estate owned by Mr. Sticker. Rather, it desired to lease the Properties. On May 6, 2005, the Smiths formed Spencer Head, LLC, with Grant Smith as its sole manager and member. The Smiths formed Bear Gate, L.P. on May 13, 2005, with Spencer Head as its managing partner. On June 21, 2005, Mr. Sticker transferred ownership of the Properties to Bear Gate. The general warranty deed transferring the Properties

from Mr. Sticker to Bear Gate was signed by Grant Smith as the vice-president of Mr. Sticker.

On June 30, 2005, Speedemissions, Mr. Sticker, and the Smiths executed the Stock Purchase Agreement. On the same day, Bear Gate and Speedemissions entered into two leases for the Properties (the "Lease Agreements").

The Stock Purchase Agreement provided that the Smiths, as shareholders of Mr. Sticker, sold "all of the outstanding shares of [Mr. Sticker] which represent all of the issued and outstanding capital stock of [Mr. Sticker]." It specifically excluded some assets, including the two Properties. The purchase price was listed as $3.1 million. The Stock Purchase Agreement also contained an arbitration provision providing that "[a]ny controversy or claim arising out of or relating to this Agreement or any related agreement shall be settled by arbitration in accordance with the following provisions." The arbitration provision further provided that the parties' agreement to arbitrate "covers all disputes of every kind relating to or arising out of this Agreement or any of the Contemplated Transactions."

The Stock Purchase Agreement defined "Contemplated Transactions" as "the transactions contemplated by this Agreement." It went on to state that the Contemplated Transactions

3

shall take place contemporaneously with the execution of this Agreement in the offices of the Purchaser. At the Closing the parties shall deliver the following documents:

1.5.1 Selling Parties' Deliveries at the Closing. The Shareholder shall deliver to Purchaser at the Closing the following items:

(i) All certificates representing the Shares, duly endorsed in blank as assigned to Purchaser;

(ii) The Company's corporate minute book and all company records, books, and materials;

(iii) A copy of the resolutions duly adopted by Company's Board of Director[s] and Shareholder authorizing the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions, certified by an officer of Company;

(iv) Unaudited financial statements and management reports for year end 2004 and financial period subsequent to June 1, 2005 and prior to the Effective Time;

(v) The Certificate of the Secretary of the Company certifying as true and correct a copy of the Articles of Incorporation and bylaws, and all amendments thereto, of the Company, dates as of the date of Closing;

(vi) A certified copy of the Articles of Incorporation of the Company and a certificate of good standing as to the Company, issued not more than fifteen (15) days prior to the Closing by the Secretary of State of the State of Texas;

(vii) The written resignations of all directors and officers of the Company effective as of the Closing;

4

(viii) Signature cards for all bank and investment accounts of the Company removing the current signatories and adding the signatories specified by Purchaser;

(ix) All other documents or instruments required by this Agreement or reasonably required by Puchaser's counsel to consummate the Contemplated Transactions.

1.5.2 <u>Purchaser's Deliveries at the Closing</u>. Purchaser shall deliver to Company Parties at the Closing, the following items:

(i) A copy of the resolutions duly adopted by the Board of Directors of Purchaser authorizing the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions, certified by an officer of Purchaser; and

(ii) All other documents or instruments required by this Agreement or reasonably required by Purchaser's counsel to consummate the Contemplated Transactions.

The Contemplated Transactions thus comprised the deliveries at the closing necessary to complete the sale of Mr. Sticker to Speedemissions under the Stock Purchase Agreement.

In addition to setting out the Contemplated Transactions required to complete the sale, the Stock Purchase Agreement contained a non-compete provision that continued in effect "so long as [Speedemissions] continues to operate the state inspection business as defined by the Texas Department of Public Safety, on the [Properties]." The non-compete provision further provided, "In the event [Speedemissions] ceases to operate said business within a period of two (2) years after close, of this transaction, this provision is no longer effective."

5

The Stock Purchase Agreement also contained a non-solicitation provision and a confidentiality provision, which provided that, in the event Speedemissions discontinued operations of a state inspections business on the Properties within a two-year period after the close of the transaction, those provisions would no longer be effective.

Finally, the Stock Purchase Agreement contained the following clause:

6.11 <u>Entire Agreement; Waiver.</u>  This Agreement of the parties hereto with respect to the subject matter hereof, and no amendment, waiver, modification or alteration of the terms hereof shall be binding unless the same be in writing, dates subsequent to the date hereof and duly approved and executed by each party.

The Stock Purchase Agreement was signed by Richard Parlontieri as the president and CEO of Speedemissions and by the Smiths as shareholders of Mr. Sticker.  There was no reference of any kind to the Lease Agreements anywhere in the Stock Purchase Agreement.

The leases between Speedemissions and Bear Gate for the Properties were contained in two separate Lease Agreements, which were identical to each other except for the exhibits identifying the leased property.  Although these Agreements were likewise executed at the closing, they contained no reference to the Stock Purchase Agreement.  Nor were the agreements between the same parties involved in the Stock Purchase Agreement.  Indeed, at the time of to closing, Mr. Sticker no longer owned or had any interest in the Properties involved in this suit—Mr.

6

Sticker had transferred its interest in the Properties to Bear Gate a week before the execution of the Stock Purchase Agreement.

The Lease Agreements provided that Speedemissions was leasing the Properties for "the operation of an automobile and light truck emissions and safety testing facility and for no other purposes. In no event shall the facility be used for automobile or light truck repair or fluid changing services." The Lease Agreements also detailed the amount of rent due during the term of the lease, which began on July 1, 2005 and ended June 30, 2010.

Each Lease Agreement contained a provision entitled "Extension or Renewal" that provided:

> Lessee shall have the right and option to renew this Lease and extend the term hereof for one (1) consecutive period of five (5) years, upon such terms and conditions as are agreed between Lessor and Lessee at least 90 days prior to the expiration of the initial term hereof. Lessee may exercise this option by giving Lessor at least sixty (60) days previous written notice of its election to make each such extension.

Each Lease Agreement also contained the following guaranty:

> For value received, I Richard Parlontieri [president of Speedemissions], absolutely, irrevocably, and unconditionally guarantee payment of this lease according to its terms to the same extent as if I were the Lessee on the Lease. This is an unconditional guaranty of payment and performance, and it is an agreement of guaranty, not surety. I waive all requirements of law, if any, that any collection efforts be made against the Lessee or that any action be brought against Lessee before resorting to this guaranty.

7

The Lease Agreements were signed by Grant Smith on behalf of Bear Gate and by Richard Parlontieri, as president of Speedemissions and as the Guarantor. At the bottom of each Lease Agreement, the parties added the following handwritten addendum to the guaranty provision: "As per verbal agreement on June 30, 2005 with Grant Smith, this personal guaranty is for the first (5) year term of this lease and expires the last day of June 2010." Neither of the Lease Agreements contained an arbitration.

In December 2009, Speedemissions and Bear Gate began negotiations concerning renewal of the leases, but they were unable to come to an agreement. Speedemissions ultimately moved out of the Properties on June 30, 2010 and leased different premises near one of the Properties.

On May 13, 2010, Speedemissions initiated an arbitration proceeding against the Smiths for fraud, breach of contract, and conversion related to violations of provisions in the leases. The Smiths moved to dismiss the arbitration, contending, in part, that Bear Gate was an indispensable party to the arbitration. On April 1, 2011, the arbitrator, the Hon. Mark Davidson, agreed that Bear Gate was indispensable to the arbitration and abated the proceeding so that Speedemissions could seek a judicial order compelling Bear Gate to submit to arbitration.

On April 15, 2011, Speedemissions filed its petition for declaratory judgment and motion to compel arbitration against Bear Gate in the trial court. It

8

argued that the Lease Agreements with Bear Gate "were part and parcel of the sale of Mr. Sticker," and, thus, the Stock Purchase Agreement and the Lease Agreements should all be read together. Speedemissions further argued that Bear Gate was subject to arbitration under the arbitration provision contained in the Stock Purchase Agreement.

In support of its argument that its dispute with Bear Gate over the terms of the Lease Agreements was subject to arbitration under the arbitration provision in the Stock Purchase Agreement, Speedemissions argued that the Stock Purchase Agreement was properly described sale/lease-back agreement and that the Lease Agreements were thus Contemplated Transactions under the terms of the Stock Purchase Agreement and were subject to all provisions of that Agreement, including the arbitrations clause. Specifically, Speedemission argued that "[t]he majority of the going concern value of Mr. Sticker was encompassed in the [stores located on the Properties] and an additional store located at 12265 Veterans Memorial, Houston, TX 77067 known as the 'Vet Store.'" It asserted, both in its pleadings and in Parlontieri's affidavit, that, prior to closing, Parlontieri

> had numerous discussions with Grant and David Smith concerning the lease-back of the [Properties]. Barbara Smith was present on at least one occasion when these discussions took place. The lease-backs were at the heart of the acquisition and these discussions began weeks prior to June 21, 2005, the date of the deeds from Mr. Sticker, Inc. and Bear Gate, L.P. The Smiths repeatedly represented to me that the lease-back would be renewable after the initial five year term at the then market value for the properties and that no personal guaranty

9

would be required for the renewals. Speedemissions relied upon these representations and would not have entered into the acquisition but for the representations concerning the lease-backs.

Speedemissions further asserted that the sale price of $3.1 million "was based in large part on obtaining an on-going concern that included at the minimum a ten year tenure at the two Bear Gate locations."

On April 11, 2012, the trial court denied Speedemissions' motion to compel arbitration, and this appeal followed.[1]

## Standard of Review

We review an order denying a motion to compel arbitration for an abuse of discretion. *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 851 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd). Thus, we defer to the trial

---

[1] We observe that, because Speedemissions is a Florida company with headquarters in Georgia that purchased a Texas entity, the contracts at issue here affect or involve interstate commerce and the Federal Arbitration Act ("FAA") applies. *See Royce Homes, L.P. v. Bates*, 315 S.W.3d 77, 85 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that the FAA applies to contracts involving or affecting interstate commerce and that interstate commerce is evidenced by, among other factors, location of headquarters in another state and trade or commerce across state lines) (citing 9 U.S.C. § 2 and *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277–81, 115 S. Ct. 834, 841–43 (1995)). Accordingly, we apply the FAA, while recognizing that the Texas Arbitration Act also applies to the extent it is consistent with the FAA. *Id.* (citing *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 803 (Tex. App.—Dallas 2008, pet. denied)); *see also In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 779–80 (Tex.2006) (orig. proceeding) (stating same). Interlocutory appeal of a trial court's denial of a motion to compel arbitration under the FAA is allowed by Civil Practice and Remedies Code section 51.016. TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (Vernon Supp. 2012); *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 850–51 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd).

court's factual determinations if they are supported by the record, and we review questions of law de novo. *Id.*

A party seeking to compel arbitration must establish that there is a valid arbitration agreement and that the claims raised fall within that agreement's scope. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *Cleveland Constr.*, 359 S.W.3d at 852. Although there is a strong presumption favoring arbitration, that presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *J.M. Davidson*, 128 S.W.3d at 227; *Cleveland Constr.*, 359 S.W.3d at 852. Ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *Kellogg Brown & Root*, 166 S.W.3d at 738; *Cleveland Constr.*, 359 S.W.3d at 852.

Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). We must examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions in the contract so that none will be rendered meaningless. *Id.* (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

Usually, the intent of the parties can be discerned from the instrument itself. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.—

11

Houston [1st Dist.] 2005, pet. denied). However, when a question relating to the construction of a contract is presented, we are required to take the wording of the instrument, consider it in light of the surrounding circumstances, and apply the rules of contract construction to determine the meaning. *Id.* (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). If, in light of the surrounding circumstances, the language is capable only of a single meaning, we confine ourselves to the writing. *Id.* Our examination of the circumstances surrounding the execution of a contract is, however, only an aid to construction. *Id.*

### Arbitration

Neither party disputes that Speedemissions is asserting claims for violations of the Lease Agreements or that the Lease Agreements do not contain an arbitration provision. However, Speedemissions argues that the agreements between itself, Mr. Sticker, the Smiths, and Bear Gate constitute a single transaction memorialized by multiple documents, including the Stock Purchase Agreement and the Lease Agreements. Speedemissions argues that the presence of the covenants not to compete, not to solicit, and to maintain confidentiality in the Stock Purchase Agreement and the Stock Purchase Agreement's various references to the Contemplated Transactions, including in the arbitration clause, indicate that the Lease Agreements were an essential part of the transaction memorialized in the Stock Purchase Agreement. It contends, therefore, that the Stock Purchase

12

Agreement and the Lease Agreements should all be read together to determine the intent of the parties with respect to arbitration.

Arbitration is a creature of contract, and parties seeking to compel arbitration must rely upon an agreement to arbitrate. *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 192 (Tex. 2007) (orig. proceeding); *In re Bayer Materialscience, LLC*, 265 S.W.3d 452, 455 (Tex. App.—Houston [1st Dist.] 2007, orig. proceeding). Thus, a party may be compelled to arbitrate only if it has entered into a valid arbitration agreement and if the claims raised fall within that agreement's scope. *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737; *J.M. Davidson*, 128 S.W.3d at 227; *Cleveland Constr.*, 359 S.W.3d at 852; *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748–49 (2011) (recognizing right of parties to agree to limit issues subject to arbitration, to arbitrate according to specific rules, and to limit with whom it will arbitrate its disputes).

Generally, "parties must sign arbitration agreements before being bound by them." *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (orig. proceeding) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). Furthermore, "[a] corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement." *Merrill Lynch Trust Co. FSB*, 235 S.W.3d at 191 (quoting *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688 (7th Cir. 2005)). "[C]orporate affiliates are generally created to separate the

13

businesses, liabilities, and contracts of each. Thus, a contract with one corporation—including a contract to arbitrate disputes—is generally not a contract with any other corporate affiliates." *Id.* "Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003) (citing *Grigson*, 210 F.3d at 528). We must "give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S. Ct. 1758, 1773–74 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 1256 (1989)). The parties' intentions as expressed in the agreement to arbitrate must control because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. *Id.* at 1774.

In determining the validity of an arbitration agreement, we apply the principles of state contract law. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (orig. proceeding). The elements needed to form a valid and binding contract are (1) an offer; (2) acceptance in strict compliance with the offer's terms; (3) a meeting of the minds; (4) consent by both parties; (5) execution and delivery; and (6) consideration. *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

14

The Texas Supreme Court has held that it is "well-established" that

> instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and that a court may determine, as a matter of law, that multiple documents comprise a written contract. In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument.

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (holding, in context of waiver of sovereign immunity, that "two ordinances and the contemporaneous, related documents" comprised parties' agreement to settle federal lawsuit, and, thus, city made agreement with school district by which it waived immunity from liability). However, "this rule is simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999) (citing *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

Preliminarily, we observe that, although Speedemissions repeatedly refers to its arrangement with Bear Gate as a "lease-back," this term does not properly describe its relationship with Bear Gate. A lease-back occurs when the entity selling the property agrees to lease back the property from the buyer. *See, e.g.*, *Avenell v. Chrisman Props., L.L.C.*, No. 14-08-01180-CV, 2010 WL 1379972, at *1 (Tex. App.—Houston [14th Dist.] Apr. 8, 2010, no pet.) (mem. op.) (describing transaction in which seller of property, through addendum to purchase agreement,

15

agreed to lease back property from buyer). Here, Speedemissions was not the buyer or the seller of the Properties—it was simply the lessee of the Properties from Bear Gate, which had received them from Mr. Sticker before the Stock Purchase Agreement was executed.

The language of the Stock Purchase Agreement and the Lease Agreements demonstrates that the parties intended for these agreements to be complete, separate agreements. The Stock Purchase Agreement and the Lease Agreements are between different parties. They each have a distinct and separate purpose. And they were not executed as part of a single stock purchase and sale/lease-back agreement.

Speedemissions complains that Bear Gate violated the terms of the Lease Agreements, the only agreements to which Bear Gate is a party. It is undisputed that the Lease Agreements do not contain arbitration provisions of their own. Nor are there any provisions in the Lease Agreements relating performance under them to the Stock Purchase Agreement between Mr. Sticker and Speedemissions—the only agreement containing an arbitration provision. Likewise, the Stock Purchase Agreement contains no reference to the Lease Agreements or to any obligations between Bear Gate and Speedemisisons. To the contrary, the Stock Purchase Agreement specifically excludes the Properties as a conveyed asset.

16

Moreover, the parties do not dispute that the transfer of the Properties from Mr. Sticker to Bear Gate did not take place contemporaneously with the with the execution of the Stock Purchase Agreement. Rather, the parties acknowledge that the transfer had already taken place a week earlier in an entirely separate transaction. Thus, at the time the Smiths, on behalf of Mr. Sticker, executed the Stock Purchase Agreement, Mr. Sticker no longer held any interest in the Properties. Speedemissions has not alleged that the Properties' transfer was fraudulent or unknown to it at the time it executed the Stock Purchase Agreement. To the contrary, by its execution of the Stock Purchase Agreement, Speedemissions acknowledged that the Properties were excluded from the Stock Purchase Agreement by the terms of the Agreement. Nor did the Stock Purchase Agreement recognize any obligation owed by Bear Gate to Speedemissions.

We conclude that Speedemissions and Bear Gate did not have a meeting of the minds that disputes under the terms of the Lease Agreements should be subject to arbitration under the terms of the Stock Purchase Agreement and that Bear Gate did not consent to arbitrate disputes arising under the Lease Agreements. *See Advantage Physical Therapy, Inc.*, 165 S.W.3d at 24. Therefore, the trial court did not err in refusing to compel Bear Gate to submit to arbitration. *See Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737 (holding that party may be compelled to

17

arbitrate only if it has entered into valid arbitration agreement and if claims raised fall within that agreement's scope).

Speedemissions, however, cites *Jones v. Kelley* to support its contention that the arbitration provision in the Stock Purchase Agreement applies to Bear Gate and to its claims under the Lease Agreements because both the Lease Agreements and the Stock Purchase Agreement were part of a single transaction between the parties. We disagree that *Jones* is applicable here.

In *Jones*, the Joneses sold a tract of real estate to the Kelleys, with some financing provided by the Veterans Land Board ("VLB"). 614 S.W.2d 95, 96–97 (Tex. 1981). The issue was whether the description of the acreage in the earnest money contract satisfied the statute of frauds. In completing the sale of the real estate, the parties executed four documents: two earnest money contracts between Jones and Kelley, an application and contract for sale between Kelley as the buyer and the VLB, and a VLB form affidavit of Jones as the seller. *Id.* at 97. One earnest money contract pertained to 36 acres of the tract that would be assignable to the VLB, which would take title to the 36 acres in its name for cash and then resell that 36 acres to the Kelleys under the provisions of the Texas Veterans Land Act. *Id.* The second earnest money contract provided that the Joneses would sell the remainder of the tract directly to the Kelleys for cash plus a note executed by the Kelleys. *Id.* The Joneses subsequently refused to convey the property and

18

argued that the description of the acreage in the earnest money contract did not satisfy the statute of frauds. *Id.* They "urge[d] a distinction in that the 36 acre tract was to be sold for cash while as to the remaining acreage, the Joneses were to retain a substantial security interest in the property." *Id.* at 98–99.

The supreme court rejected the Joneses' argument and stated that, "[i]n the present suit the transaction is the sale of the entire tract. Without the Veterans Land Board financing referred to in the contracts, the sale of the entire tract would not be complete." *Id.* at 98. The supreme court held that the four instruments at issue in *Jones* should be construed together and thus the description of the acreage in the earnest money contract did satisfy the statute of frauds, stating:

> The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. The courts have construed contracts and instruments together in various situations in order to ascertain the intent of the parties. Several decisions indicate that instruments may be construed together or treated as one contract even though they are not between the same parties.

*Id.* at 98 (internal citations omitted). It went on to state:

> Looking at the complete transaction it was the clear intent of both the Joneses and the Kelleys that the execution of the four documents was for the primary purpose of conveying all the subject property to the Kelleys. The property was listed by the real estate agent as one tract and the Kelleys intended to purchase the entire tract. Financing through the Veterans Land Board was only a means of achieving this objective. The Veterans Land Board was only interested in aiding Kelley, a veteran, in his purchase of the property and not in any acquisition of its own. . . . Both of the earnest money contracts refer

19

> to the Veterans Land Board. The execution of four documents in this instance was only a means of accomplishing the singular and primary purpose of conveying the Joneses' entire tract to the Kelleys.

*Id.* at 99. The considerations in *Jones* were thus entirely different from those in this case, in which the Stock Purchase Agreement effected the sale of Mr. Sticker to Speedemissions and the separate Lease Agreements set out the terms under which Speedemissions agreed to lease the Properties previously transferred from Mr. Sticker to Bear Gate. Indeed, the rule set out in *Jones*—that "separate instruments or contracts executed at the same time, *for the same purpose, and in the course of the same transaction*" are to be read and construed together—is plainly not satisfied here. *See id.* at 98.

By contrast, the Amarillo Court of Civil Appeals addressed a situation substantially similar to this one in *A.J. Robbins & Co. v. Roberts*, 610 S.W.2d 854 (Tex. Civ. App.—Amarillo 1980, writ ref'd n.r.e.). In that case, A.J. Robbins and Co. bought the majority of the assets of a lumber business and, in a separate agreement, leased from the seller the premises where the business was conducted. *Id.* at 855. Roberts subsequently sought to impose an obligation to pay ad valorem taxes on A.J. Robbins and Co., the lessee, in spite of the fact that the lease contract did not contain such a provision. *Id.* Roberts argued that the purchase contract and the lease contract "jointly demonstrate a single transaction and must be construed together as one contract," and the purchase contract contained a provision

20

requiring proration of ad valorem taxes to the date of closing, which required the

A.J. Robbins and Co. "to be responsible for all ad valorem taxes, not only on the

personalty conveyed under the purchase contract, but also on the realty leased

under the lease contract. . . ." *Id.*

The court declined to impose an obligation to pay ad valorem taxes under

the leases based on the language in the purchase contract. *Id.* at 856–57. It

reasoned:

> Each of the contracts is intrinsically complete and each has a distinct
> and separate purpose. This is not a case where various writings must
> be put together in order to ascertain a single contractual obligation.
> The purchase contract establishes the terms and conditions for the
> conveyance of the personal property of the lumber yard. The lease
> contract establishes the terms and conditions for the lease of the realty
> where the lumber yard will do business. Although each refers to the
> other and consummation of the purchase contract was, at Robbins'
> option, dependent upon consummation of the lease contract, specific
> obligations assumed under one contract cannot be used to alter, amend
> or add to specific obligations assumed under the other contract. To do
> so would be to apply the general principle "arbitrarily and without
> regard to the realities of the situation."

*Id.* (quoting *Miles*, 321 S.W.2d at 65). The court also quoted the Fifth Circuit in

reaching its conclusion: "Thus, while recognizing that two or more separate

agreements executed contemporaneously are to be construed together, perhaps

even as one instrument, this does not mean that all are bodily consolidated into one

instrument so that every provision in one instrument thereby becomes a part of

21

every other instrument." *Id.* at 857 (quoting *Lawrence v. United States*, 378 F.2d 452, 461 (5th Cir. 1967)).

We conclude that the reasoning in *A.J. Robbins* and *Lawrence* is applicable here, with the distinction that here, unlike in *A.J. Robbins*, the contracts Speedemissions asks us to read and construe together do *not* even reference each other. As we have already discussed, both the Stock Purchase Agreement between Speedemissions and the Smiths on behalf of Mr. Sticker and the Lease Agreements between Speedemissions and Bear Gate are intrinsically complete. Neither relies upon the other to provide any essential term. *See id.* at 856; *cf. Jones*, 614 S.W.2d at 98 (holding that all four documents relating to transfer of single tract of land may be read together for purposes of satisfying statute of frauds because, "[w]ithout the Veterans Land Board financing referred to in the contracts, the sale of the entire tract would not be complete"). The agreements are between different parties, and they each have a distinct and separate purpose. *See A.J. Robbins & Co.*, 610 S.W.2d at 856 (noting fact that contracts have distinct and separate purpose). These facts stand in contrast to the circumstances in *Jones* and the cases it relied upon, in which multiple documents were executed to complete a single transaction for the same purpose. *See Jones*, 614 S.W.2d at 98 (citing *Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951) (stating that "[a]ll of the instruments were a necessary part of the same transaction") and *Veal v.*

22

*Thomason*, 159 S.W.2d 472, 475 (Tex. 1942) (holding that each instrument contained recitals showing that execution of similar leases by other lessors was contemplated by parties, and several leases were held to constitute but one contract just as though all lessors had signed same piece of paper)).

We likewise disagree with Speedemissions' ancillary arguments. Speedemissions argues that "[w]ithout a lease-back on the two properties, the sale of the business could not occur. Without a sale of the business, the lease-backs would not occur." However, this contention is not supported by the language of either the Stock Purchase Agreement or the Lease Agreements. There is no "lease-back" in this transaction, as Speedemissions was not the buyer or the seller of the Properties—it was simply the lessee of the Properties from Bear Gate, which was not a party to the Stock Purchase Agreement. *See Avenell.*, 2010 WL 1379972, at *1. Moreover, here, unlike in *A.J. Robbins*, consummation of one contract was not conditioned on consummation of another. *See A.J. Robbins & Co.*, 610 S.W.2d at 856; *see also ExxonMobil Corp.*, 174 S.W.3d at 312 (holding that intent of parties usually can be discerned from instrument itself and that "we can confine ourselves to the writing" if, in light of surrounding circumstances, language is capable only of single meaning). Performance under the Stock Purchase Agreement was not conditioned upon execution of or performance under the Lease Agreements, and performance under the Lease Agreements was not conditioned upon execution of

23

or performance under the Stock Purchase Agreement. Nor did the Stock Purchase Agreement include the Lease Agreements among the deliveries to be made at the closing in its description of the "Contemplated Transactions."

Speedemissions also argues that, without the Lease Agreements, the Stock Purchase Agreement is made illusory. Speedemissions argues that the non-compete, non-solicitation, and confidentiality provisions in the Stock Purchase Agreement "clearly contemplate[] and require[] the immediate occupation upon closing and the continued occupation thereafter of the two lease-back properties by Speedemissions." It argues that because the Properties were excluded from the sale and retained by the Smiths in some capacity, "the properties must be leased back to Speedemissions in order to avoid the automatic termination of each of the covenants. As a practical matter, until Speedemissions acquired some right to occupy the property (a right not granted under the purchase agreement but only under the lease-backs) the covenants to not compete, not solicit, and maintain confidentiality, all key considerations to the purchase agreement, would be illusory." However, this argument misrepresents the terms of the Stock Purchase Agreement.

"A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance." *Cleveland Constr.*, 359 S.W.3d at 853 (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (per

24

curiam) (orig. proceeding)). Here the non-compete, non-solicitation, and confidentiality provisions do not provide either party with the unilateral option to discontinue performance; rather, these provisions describe the rights and liabilities of the parties under various contemplated contingencies, including deeming the provisions "not effective in the event [Speedemissions] discontinues operations of a state inspection business" on the Properties. *See id.*

We conclude, as did the court in *A.J. Robbins & Co.*, that "specific obligations assumed under one contract cannot be used to alter, amend or add to specific obligations assumed under the other contract." *See A.J. Robbins & Co.*, 610 S.W.2d at 856; *see also DeWitt Cnty. Elec. Co-op.*, 1 S.W.3d at 102 (considering various documents executed contemporaneously with easement agreement and stating, "But we must recognize that provisions in each differ" in holding that general provisions in two agreements "cannot override other, more specific provisions . . . that spell out in detail the parties' respective rights").

Finally, Speedemissions argues that Bear Gate can be compelled to arbitrate under the direct benefits doctrine of estoppel. A person who seeks by his claim to derive a direct benefit from a contract containing an arbitration provision may be equitably estopped from refusing arbitration even if he is not a signatory to that contract. *See Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006) (citing

25

*In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761–62 (Tex. 2006) (per curiam) and

*In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 741).

Speedemissions argues that "Bear Gate received substantial benefit from the lease-back of the property; a lease-back that would not have occurred absent the contemporaneous execution of the Purchase Agreement and retention of the properties by the Smiths under that agreement and the conveyance of the properties themselves from the corporation being acquired by Bear Gate as part of the acquisition structure."[2] Thus, Speedemissions' own argument asserts that the only direct benefit to Bear Gate flowed through the leases. Bear Gate was not a party to the Stock Purchase Agreement and received no direct benefit under its terms. In this suit, neither Speedemissions nor Bear Gate is seeking a direct benefit granted by the Stock Purchase Agreement or relying on a claim or defense arising under that agreement. Thus, the direct benefits doctrine of estoppel does not apply here. *See id.*

We overrule Speedemissions' sole issue.

---

[2] To the extent Speedemissions is attempting to assert that the Smiths are individually liable under the leases or that they retained an interest in the Properties, we reject that argument, as Speedemissions has not alleged or proven any abuse of the corporate form. *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) ("Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse. . . .").

## Conclusion

We affirm the order of the trial court denying Speedemissions' motion to compel arbitration.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Massengale, and Brown.