ACCEPTED
01-14-01018-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/17/2015 5:12:09 PM
CHRISTOPHER PRIN
CLERK

## CASE NO. 01-14-01018-CV

**IN THE COURT OF APPEALS FOR
THE FIRST DISTRICT OF TEXAS
HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
2/17/2015 5:12:09 PM
CHRISTOPHER A. PRINE
Clerk

**RICKY D. PARKER AND JAMES MYERS,**
*Appellant,*
**v.**

**SCHLUMBERGER TECHNOLOGY CORPORATION,**
*Appellee.*

Interlocutory Appeal
from the 268th District Court of Fort Bend County, Texas
Cause Number 14-DCV-218252

## APPELLEE'S BRIEF ON THE MERITS

_____

Jeff Barnes
State Bar No. 24045452
barnesj@jacksonlewis.com
JACKSON LEWIS P.C.
1415 Louisiana, Suite 3325
Houston, Texas  77002
PH:  (713) 650-0404
FX:  (713) 650-0405

William L. Davis
State Bar No. 05563800
davisw@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH:  (214) 520-2400
FX:  (214) 520-2008

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE ..............................................................................1

II. ISSUES PRESENTED ....................................................................................2

III. STATEMENT OF FACTS ...............................................................................3

A. Parker sold his wireline, slick line, and braided line business to Schlumberger.3

B. Parker and Myers agreed to post-employment restrictive covenants ...................3

C. Parker, and later Myers, ran the business that Schlumberger purchased..............6

D. Parker formed a wireline, slick line, and braided line business in competition with Schlumberger ..........................................................................................6

E. Myers "retired" on September 16, 2014........................................................8

F. Parker and Myers solicited, recruited, and hired Schlumberger employees .........8

G. Parker and Myers solicited Schlumberger customers.......................................9

H. Parker and Myers admit they breached their restrictive covenant agreements ..10

IV. PROCEDURAL BACKGROUND ..................................................................13

V. SUMMARY OF ARGUMENT .......................................................................15

VI. ARGUMENT ...............................................................................................17

A. The District Court properly entered a temporary injunction against Appellees 17

   1. Standard of review ...............................................................................17

   2. The temporary injunction does not contain an "industry wide" exclusion ......18

   3. The temporary injunction only restricts Appellants from working in wireline, slick line, and braided line operations ...........................................................20

   4. The temporary injunction contains reasonable geographic limitations............20

   5. The temporary injunction contains reasonable customer restrictions ..............22

   6. The temporary injunction contains reasonable time limitations.....................25

7. Schlumberger offered evidence of irreparable harm ........................................28

B. The District Court properly applied Texas law....................................................30

  1. Standard of review ..................................................................................30

  2. The application of Texas law is not contrary to a fundamental policy of Oklahoma ...............................................................................................30

  3. Oklahoma does not have a more significant relationship than Texas ..............35

  4. Oklahoma does not have a materially greater interest in the determination of the issue....................................................................................................39

C. This Court lacks jurisdiction to review the District Court's denial of Appellants' motion for reconsideration ................................................................................41

D. The District Court properly denied Appellants' motion to compel arbitration .42

  1. Standard of review ..................................................................................42

  2. Appellants did not present the entire APA to the District Court......................43

  3. There is no arbitration agreement between Schlumberger and Myers.............44

  4. The District Court was required to determine the arbitrability of Schlumberger's claims against Myers ...............................................................48

  5. The District Court properly concluded that Schlumberger's claims against Parker are outside the scope of the APA ........................................................49

  6. The District Court did not err by deciding the arbitrability of Schlumberger's claims against Parker ................................................................................52

**VII. PRAYER** .....................................................................................................57

CERTIFICATE OF COMPLIANCE .......................................................................59

CERTIFICATE OF SERVICE ................................................................................59

# INDEX OF AUTHORITIES

**Cases**

*Ameripath, Inc. v. Hebert*, 447 S.W.3d 319 (Tex. App.—Dallas 2014, pet. filed) .27

*Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). ................................................................. 26, 27

*American Express Financial Advisors v. Scott*, 955 F. Supp. 688 (N.D. Tex. 1996) ................................................................................................28

*AT&T Technologies., Inc. v. Communications Workers of America*, 475 U.S. 643 (1986) ................................................................................49

*Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168 (Okla. 1989) ......................34

*Burlington Resources Oil & Gas Co., LP v. San Juan Basin Royalty*, 249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007) ..................................... 53, 55

*Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ................................................................21

*Butnuru v. Ford Motor Co.*, 8 S.W.3d 198 (Tex. 2002) ..........................................17

*CMH Homes v. Perez*, 340 S.W.3d 444 (Tex. 2011) ..............................................41

*Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ................................................................19

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670 (Tex. 1990) .................................30

*Digges v. Knowledge Alliance, Inc.*, 176 S.W.3d 463 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ................................................................42

*Eakle v. Grinnell Corp.*, 272 F. Supp. 2d 1304 (E.D. Okla. 2003) ...... 31, 32, 33, 34

*Elgohary v. Herrera*, 405 S.W.3d 785 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ................................................................................49

*EMS USA, Inc. v. Shary*, 309 S.W.3d 653 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ................................................................................17

*Ennis, Inc. v. Dunbrooke Apparel Corp.*, 427 S.W.3d 527 (Tex. App.—Dallas

2014, no pet.) ..............................................................................................36

*Exxon Mobil Corp. v. Drennen*, --- S.W.3d ----, 2014 Tex. Lexis 760 (Tex. Aug. 29, 2014) ................................................................................. 38, 39

*Farren v. Autoviable Serv., Inc.*, 508 P.2d 646 (Okla. 1973) ...................................31

*Gallagher Healthcare Insurance Services v. Vogelsang*, 312 S.W.3d 640 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ..................................22

*Hill v. GE Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002)..............................46

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) ...................................48

*In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732 (Tex. 2005)...........................44

*In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185 (Tex. 2007) ..........................45

*In re Rubiola*, 334 S.W.3d 220 (Tex. 2011) ..........................................................48

*In re Service Corporation International*, 355 S.W.3d 655 (Tex. 2011)..................49

*In re Weekley Homes, LP*, 180 S.W.3d 127 (Tex. 2005)................................. 44, 45

*James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006) ........... 55, 56

*Karlin v. DCP Midstream, LP*, 2013 Tex. App. Lexis 6966 (Tex. App.—Amarillo June 6, 2013, pet. denied) ...........................................................47

*Loy v. Harter*, 128 S.W.3d 397 (Tex. App.—Texarkana 2004, pet. denied) ..........51

*Mabrey v. Sand Stream, Inc.*, 124 S.W.3d 302 (Tex. App.—Fort Worth 2003, no pet.) ..............................................................................................51

*M-I LLC v. Lee*, 733 F. Supp. 2d 759 (S.D. Tex. 2010) .........................................21

*Nazareth Hall Nursing Center v. Castro*, 374 S.W.3d 590 (Tex. App.—El Paso 2012, no pet.) ................................................................................. 41, 42

*ODL Services, Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ...................................................................... 52, 54

*Oliver v. Omnicare, Inc.*, 103 P.3d 626 (Okla. Ct. App. 2004).............................32

*Osornia v. Amerimex Motor & Controls, Inc.*, 367 S.W.3d 707 (Tex. App.—

Houston [14th Dist.] 2012, no pet.) ..................................................43

*Per Group LP v. Medical Media Holdings, LLC*, 294 S.W.3d 378 (Tex. App.—
    Dallas 2009, no pet.) ..............................................................54

*Pre-Paid Legal Servs., Inc. v. Cahill*, 924 F. Supp. 2d 1281, 1290 (E.D. Okla.
    2013) )………………………………………………………………… 33

*Roe v. Ladymon*, 318 S.W.3d 502 (Tex. App.—Dallas 2010, no pet.) ...................48

*Schlumberger Technology Corp. v. Baker Hughes, Inc.* 355 S.W.3d 791 (Tex.
    App.—Houston [1st Dist.] 2011, no pet.)..................................... 53, 57

*Skyleasing, LLC v. Tejas Acvo, Inc.*, 2006 Tex. App. Lexis 7098 (Tex. App.—
    Houston [14th Dist.] Aug. 10, 2006, no pet.) ................................. 46, 48

*Speedemissions, Inc. v. Bear Gate, LP*, 404 S.W.3d 34 (Tex. App.—Houston [1st
    Dist.] 2013, no pet.) ........................................................ 42, 43, 47

*The Branch Law Firm, LLP v. Osborn*, 447 S.W.3d 390 (Tex. App.—Houston
    [14th Dist.] 2014, no pet. h.)....................................................44

*The Inland Sea, Inc. v. Castro*, 420 S.W.3d 55 (Tex. App.—El Paso 2012, pet.
    denied)..............................................................................45

*Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742 (S.D. Tex. 2009)...29

*Unitel Corp. v. Decker*, 731 S.W.2d 636 (Tex. App.—Houston [14th Dist.] 1987,
    no writ)..............................................................................28

*Vaughn v. Intrepid Directional Drilling Specialists, Ltd.*, 288 S.W.3d 931 (Tex.
    App.—Eastland 2009, no pet.) ..................................................24

*VSR Financial Services, Inc. v. McLendon*, 409 S.W.3d 817 (Tex. App.—Dallas
    2013, no pet.) ............................................................... 44, 45, 47

*Wetzel v. Sullivan, King & Sabom, P.C.*, 745 S.W.2d 78 (Tex. App.—Houston [1st
    Dist.] 1988, no writ)..............................................................43

*Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289 (Tex. App.—Beaumont 2004,
    no pet.) ..............................................................................28

*XL Insurance Co. v. Hartford Accident and Indemnity Co.*, 918 S.W.2d 687 (Tex.

App.—Beaumont 1996, pet. dism'd w.o.j.)............................................................50

*Zep Manufacturing Co. v. Harthcock*, 824 S.W.2d 654 (Tex. App.—Dallas 1992,
no writ)......................................................................................................20

**Statutes**

9 U.S.C. § 16................................................................................... 41, 42

Okla. Stat. tit. 15 § 218 ...........................................................................31

Tex. Bus. & Comm. Code § 15.50(a) ......................................................18

Tex. Civ. Prac. & Rem. Code § 51.016 ............................................. 41, 42

Tex. R. App. P. 33.1(a) ................................................. 22, 26, 28, 34, 39

Tex. R. Evid. 801(d)................................................................................23

**Other Authorities**

*Restatement (Second) of Conflict of Laws* § 187 ................................. 30, 38

# I.  STATEMENT OF THE CASE

Appellee Schlumberger Technology Corporation ("Schlumberger") filed the underlying proceeding on October 8, 2014 to enforce restrictive covenant agreements with two former Schlumberger managers, Appellants Ricky Parker and James Myers.  The District Court entered a TRO in favor of Schlumberger on October 9, 2014 and set Schlumberger's application for a temporary injunction for hearing within fourteen days.  After two agreed extensions of the TRO, the District Court presided over the temporary injunction hearing on December 5 and 8, 2014.  Appellants did not appear to testify at the temporary injunction hearing, but their counsel attended.  After the two-day hearing, the District Court determined that Schlumberger had satisfied the prerequisites for a temporary injunction against Appellants and entered a temporary injunction to maintain the *status quo* until a trial on the merits, which the District Court set for March 17, 2015.  The parties later agreed to continue the trial setting until May 18, 2015.

## II.    ISSUES PRESENTED

1.    Did the District Court abuse its discretion when it enjoined Appellants from competing in the wireline, slick line, and braided line business in a limited geographical area?

2.    Does Section 51.016 of the Texas Civil Practice and Remedies Code authorize an interlocutory appeal from the District Court's order denying Appellants' motion to reconsider the denial of their motion to compel arbitration?

3.    Did the District Court abuse its discretion when it denied Appellants' motion to compel arbitration?

## III.  STATEMENT OF FACTS

### A. Parker sold his wireline, slick line, and braided line business to Schlumberger

Parker owned and operated Parker Energy Services ("Parker Energy"), which provided wireline, slick line, and braided line services to operators in the oilfield.  (2 R.R. 15, 17-18.)  Myers was second-in-command at Parker Energy.  (2 R.R. 19.)  Parker sold his company to Schlumberger for $17,000,000 in September 2011.  (2 R.R. 15, 18, 26.)  Given that the primary value of Parker Energy was its customer relationships and employees, the parties attributed $15,000,000 of the purchase price to goodwill.  (2 R.R. 18, 26.)

### B. Parker and Myers agreed to post-employment restrictive covenants

In connection with the sale of Parker Energy and as part of transitioning their employment to Schlumberger, Parker, Myers, and other Parker Energy employees joining Schlumberger signed Intellectual Property, Confidential Information, and Non-Compete Agreements ("ICN Agreements").   (2 R.R. 20.)  By signing the ICN Agreements, Parker and Myers promised that, for one-year after the termination of their employment, they would not:

- Solicit, recruit, or hire Schlumberger employees; or

- Work for a competitor in the same business segment in which they worked for Schlumberger (*i.e.*, wireline, slick line, and braided line).[1]

---

[1] Parker and Myers' ICN Agreements contain geographical limitations that are broader than what Schlumberger sought to enforce in the underlying proceeding.  Schlumberger only sought to enjoin Parker and Myers from competing in the counties in which they worked and managed

3

(5 R.R. Ex. 1 ¶¶ 5, 13; Ex. 2 ¶¶ 5, 13.) Parker and Myers agreed in the ICN Agreements that these post-employment restrictions were reasonable. (5 R.R. Ex. 1 ¶ 9; Ex. ¶ 9.)

The ICN Agreements also contain Texas choice of law and mandatory venue provisions:

> Because Employee may work in various locations and to eliminate potential certainty over the governing law, this Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Texas. Venue for any dispute(s) arising from or related to this Agreement shall lie solely, and is convenient, in Fort Bend County, Texas. Employee consents to the choice of law and venue provisions of this Agreement and agrees that Employee will not contest these provisions in any future proceeding(s). Employee agrees that Texas, as the Company's United States Headquarters, has a greater legal interest in matters relating to this Agreement than any other state, has a greater public policy interest in matters relating to this Agreement than any other state, and has a greater factual relationship to matters relating to this Agreement than any other state.

(5 R.R. Ex. 1 ¶ 17; Ex. 2 ¶ 17.)

In addition to the ICN Agreement, to protect the goodwill that Schlumberger was purchasing from Parker Energy, Myers was required to sign a Retention Bonus Agreement. (2 R.R. 19; 5 R.R. Ex. 3.) Myers promised that, for a year after the termination of his employment, he would not:

- Solicit, recruit, or hire Schlumberger employees;

---

while employed by Schlumberger, and where Schlumberger performed wireline, slick line, and braided line jobs for customers about which Parker and Myers obtained Company Confidential Information. (C.R. 19.)

- Solicit or accept work from customers that he dealt with on behalf of Schlumberger that is substantially similar to the work he performed for Schlumberger;

- Provide services to customers that he dealt with on behalf of Schlumberger that are substantially similar to the services he performed while at Schlumberger; and

- Perform work for a competitor that is substantially similar to the work he performed for Schlumberger in the geographic territory serviced by the Schlumberger office in which he worked.

(5 R.R. Ex. 3 ¶ 5.)

Conditioned on his compliance with the post-employment restrictive covenants and his agreement to work for Schlumberger for at least two years, Schlumberger paid Myers $100,000 as part of the Retention Bonus Agreement. (*Id*. ¶¶ 1, 2, 12; 2 R.R. 55.) Although (as explained below) Myers clearly failed to live up to the post-employment promises he made in the Retention Bonus Agreement, he has not repaid Schlumberger the $100,000 that he received. (2 R.R. 58-59.)

In the Retention Bonus Agreement, Myers also agreed that the Judicial District Courts of Fort Bend County had "exclusive jurisdiction" to settle any disputes relating to the Retention Bonus Agreement. (5 R.R. Ex. 3 ¶ 11.) Myers irrevocably consented to the jurisdiction and venue of the Judicial District Courts of Fort Bend County for any disputes arising out of or relating to the

Retention Bonus Agreement. (*Id.*) Finally, like the ICN Agreements, the Retention Bonus Agreement contains a Texas choice of law provision. (*Id.*)

## C. Parker, and later Myers, ran the business that Schlumberger purchased

Parker and Myers became Schlumberger employees after the sale of Parker Energy. (2 R.R. 15-16.) Parker remained in charge of the wireline, slick line, and braided line business that Schlumberger purchased. (*Id.*) Myers managed the business's operations and supervised the field crews. (2 R.R. 16.) During the time when Parker was in charge of the business, Parker and Myers managed wireline, slick line, and braided line work in Texas, Oklahoma, Louisiana, Arkansas, and Pennsylvania. (3 R.R. 25, 52-53.)

Parker retired from Schlumberger in October 2013, though he continued to come into the office periodically. (2 R.R. 16, 23-24.) After Parker's retirement, Myers became the "[n]umber one person in charge." (2 R.R. 15-16.) Myers managed wireline, slick line, and braided line work performed in Texas, Oklahoma, Louisiana, Arkansas, Pennsylvania, Ohio, West Virginia, and New York. (2 R.R. 49, 51; 5 R.R. Ex. 74.)

## D. Parker formed a wireline, slick line, and braided line business in competition with Schlumberger

Unbeknownst to Schlumberger at the time, Parker formed Professional Wireline, LLC ("PWL") after his retirement. (2 R.R. 60; 3 R.R. 32.)

PWL is a wireline, slick line, and braided line company. (2 R.R. 46.) There is no question that Schlumberger and PWL are competitors. (2 R.R. 58; 3 R.R. 32.)

Parker ordered six wireline trucks for PWL in December 2013 or January 2014 at a cost of over $2 million. (3 R.R. 46.) At his deposition, Parker refused to answer whether he also ordered several hundred thousand dollars of tools in April 2014, though he admitted sending the vendor an email titled "Top Secret" during that time because he did not want Schlumberger to know that he was building tools for PWL. (3 R.R. 46-47.) Parker also purchased eight or nine pick-up trucks for PWL at the end of August 2014 or first of September 2014. (3 R.R. 48.) Parker admitted that he purchased this number of trucks because he knew at the time that Schlumberger employees were joining PWL. (3 R.R. 49.)

Myers was involved in PWL's business activities while he was still working for Schlumberger. Prior to Myers' resignation, he worked with Parker to procure and test equipment and tools, and helped put Master Service Agreements in place with customers. (3 R.R. 35, 41, 103.) Furthermore, as early as April 2014, Myers ordered expensive tools for PWL *on Schlumberger's dime*. (3 R.R. 106-09.) Myers ordered equipment for a new truck in April 2014, even though Schlumberger did not put any new trucks into service in April 2014 or during the following months, and had no use for the equipment that Myers ordered. (3 R.R.

108-09, 112.) Moreover, Schlumberger has been unable to locate the equipment Myers ordered. (3 R.R. 106-09.)

## E. Myers "retired" on September 16, 2014

Myers resigned from Schlumberger at about 6:00 p.m. September 16, 2014. (3 R.R. 60; 5 R.R. Ex. 17.) Myers told Schlumberger that he was "retiring" despite being only about forty-five years old. (3 R.R. 90; 5 R.R. Ex. 17.) Myers claims that he had "all intentions of retiring" when he sent his resignation email, yet the morning after his "retirement" he officially started working for PWL and soliciting Schlumberger's customers to move their work to PWL. (2 R.R. 34; 3 R.R. 58, 67-68.)

## F. Parker and Myers solicited, recruited, and hired Schlumberger employees

Only thirty minutes after his resignation, Myers held a "party" at his home. (3 R.R. 59-60.) The only attendees at this "party" were four Schlumberger employees who had reported to Myers, and their wives. (3 R.R. 61.) Myers told the Schlumberger employees he was going to work PWL (despite having "all intentions of retiring" just thirty minutes earlier) and instructed them to visit with Parker about a job at PWL. (3 R.R. 60-62.)

One of the dinner attendees, Daniel Harrison, a Schlumberger field specialist, gave Schlumberger notice of his resignation about six hours later, at 3:50 a.m. on September 17, 2014. (2 R.R. 36-37.) Eight more Schlumberger

employees who had reported to Myers resigned throughout that same day, and another employee resigned on September 18, 2014. (3 R.R. 84; 5 R.R. Ex. 9.) All of the employees who resigned immediately joined PWL without any notice to Schlumberger, which left Schlumberger without the personnel to cover jobs. (2 R.R. 37; 3 R.R. 99.) Moreover, Parker and Myers hired these employees despite knowing that each employee had an ICN Agreement that prevented him from working for PWL for a year after his resignation from Schlumberger. (3 R.R. 40, 71.) In total, in just twenty-four hours after Myers' resignation, PWL poached about half of the workforce that Schlumberger had entrusted to Parker and Myers before their resignations. (2 R.R. 37; 5 R.R. Ex. 9.)[2]

## G. Parker and Myers solicited Schlumberger customers

The morning after Myers' resignation, he began soliciting the same customers that he dealt with at Schlumberger. (2 R.R. 56; 3 R.R. 66-70.) Myers and Harrison met with BP the morning of September 17, 2014. (3 R.R. 87-88.) BP requires at least one day's advanced notice of appointments, which indicates that Myers scheduled the appointment while still employed by Schlumberger and before he gave notice of his resignation. (3 R.R. 88-90.) Myers also solicited Unit Petroleum, Jones Energy, Linn Energy, LTO, Chesapeake, and Chevron on

---

[2] Schlumberger's GPS records also showed that some of the Schlumberger employees who joined PWL had visited PWL's office the week before Myers' resignation. (2 R.R. 52; 3 R.R. 96.)

September 17, 2014. (3 R.R. 90.) Parker solicited Linn Energy, Unit Petroleum, and XTO, all prior to September 23, 2014. (3 R.R. 32-33.)

Just seven days after Myers' resignation, PWL was already signing up to do business with XTO, Linn Energy, and Unit Petroleum. (3 R.R. 33.) Within ten days of Myers' resignation, PWL performed a job for XTO. (3 R.R. 36.) Prior to the District Court's entry of the TRO (still just a few weeks after Myers' resignation), PWL had already performed jobs for XTO, Linn Energy, and Unit Petroleum—all Schlumberger customers with whom Parker and Myers dealt during their employment with Schlumberger. (3 R.R. 66, 115; 5 R.R. Ex. 13.)

## H. Parker and Myers admit they breached their restrictive covenant agreements

There is absolutely no doubt that Parker and Myers breached the restrictive covenants in the ICN Agreements and Myers' Retention Bonus Agreement. Parker admitted that he breached his ICN Agreement by operating a competing wireline, slick line, and braided line business, and by hiring Schlumberger employees. (3 R.R. 32, 41-43.) Myers admitted that he violated his agreements by working for PWL immediately after his "retirement." (3 R.R. 65-66.) The evidence—which Myers did not refute at the temporary injunction hearing—also clearly demonstrated that Myers breached the customer and employee non-solicitation provisions in the ICN Agreement and Retention Bonus Agreement. (3 R.R. 59-63, 66-70, 87-90.)

Several additional facts from the temporary injunction hearing favor the District Court's balance of equities in favor of Schlumberger:

- The District Court could have easily concluded that Parker and Myers lacked any credibility. They did not appear to testify at the temporary injunction hearing and their deposition testimony, which was offered into evidence, was replete with evasive "I don't know" and "I don't remember" answers to simple questions. For example, when Myers was questioned about numerous text messages between Myers and Parker about PWL before Myers' resignation (texts that Appellants produced in expedited discovery), Myers answered all questions about the texts with "I do not know" or "I do not remember." (3 R.R. 76-77.)

- The evidence at the temporary injunction hearing indicated that Myers diverted business to PWL prior to his resignation. (3 R.R. 101-102.)

- Just hours before his resignation, Myers lied to his supervisor and said he was not leaving Schlumberger. (3 R.R. 94.)

- The District Court could have concluded that Parker named his start-up company to trick customers into thinking it was part of Schlumberger. The business Parker ran for Schlumberger used the name Production Wireline, which was abbreviated as PWL. (2 R.R. 60; 3 R.R. 75.) Parker named his new company Professional Wireline, which also uses the abbreviation PWL. (2 R.R. 60; 3 R.R. 75.)

- Evidence at the temporary injunction hearing indicated that Parker continued to operate PWL in violation of the District Court's TRO. (4 R.R. 104.)

- Following the entry of the TRO, Myers gave Parker the phone he used at Schlumberger, which Parker gave to another PWL employee, so PWL could get business if a Schlumberger customer called Myers. (3 R.R. 39, 59.)

- Operators will not hire a service company to do work unless the company has a satisfactory Health, Safety, and Environmental ("HSE") manual. (3 R.R. 129.) PWL's HSE manual is virtually identical to the HSE manual purchased by Schlumberger when it bought Parker's business. (3 R.R. 125.) By copying Schlumberger's HSE manual instead of creating its

own from scratch, PWL accelerated the time that is required for a start-up to be in a position to obtain work from customers.  (3 R.R. 129.)

- PWL's price list is very similar to Schlumberger's price list, but Myers could not explain the similarities even though he was the one responsible for creating PWL's price list.  (3 R.R. 73-74.)

## IV. PROCEDURAL BACKGROUND

The District Court entered a TRO against Appellants on October 9, 2014. (C.R. 46-53.) After agreed extensions of the TRO, the District Court held a temporary injunction hearing on December 5 and 8, 2014. (C.R. 296.) Matt Billingham, Schlumberger's North American Production Manager, and Mike Yarborough, Schlumberger's U.S. Slickline Manager, testified on behalf of Schlumberger. (2 R.R. 13; 3 R.R. 80-81.) Parker and Myers did not appear for the temporary injunction to provide any testimony, and Schlumberger submitted excerpts of their deposition testimony into evidence.

After a two-day hearing, the District Court granted Schlumberger's request for a temporary injunction. (C.R. 296.-305.) The temporary injunction contains restrictions on Parker and Myers' solicitation of Schlumberger employees and use of Schlumberger confidential information, which Appellants have not appealed. (C.R. 304-05.) The temporary injunction also provides:

- Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.

- Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or services, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.

- Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing, wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

(C.R. 305.) These are the only portions of the temporary injunction that Appellants have appealed. Appellants also challenge the District Court's denial of their motion to compel arbitration, and denial of their motion for reconsideration of that motion. (C.R. 284-85.)

## V. SUMMARY OF ARGUMENT

The District Court correctly determined that Schlumberger satisfied the prerequisites for a temporary injunction. There was no dispute at the temporary injunction hearing that Parker and Myers breached their restrictive covenant agreements (and Appellants do not argue otherwise on appeal). Moreover, the District Court's temporary injunction tailored restrictions on Appellants' competitive activities that are reasonable based on the evidence presented at the temporary injunction hearing. Finally, Schlumberger easily established the required showing of irreparable harm, as Texas law considers a former employee's breach of a restrictive covenant agreement to be the epitome of irreparable injury.

Nor did the District Court abuse its discretion when applying the Texas choice of law provisions in the ICN Agreements and Retention Bonus Agreement at the temporary injunction stage. Oklahoma enforces non-compete agreements that are formed in connection with the sale of a business. The evidence at the temporary injunction hearing established that the ICN Agreements and Retention Bonus Agreement were formed in connection with the sale of Parker Energy. Because the public policy of Oklahoma authorizes non-compete agreements in this context, the application of Texas law to the ICN Agreements and Retention Bonus Agreement is not contrary to a fundamental policy of

Oklahoma. Additionally, independent of the fact that the application of Texas law was not contrary to a fundamental policy of Oklahoma, the District Court correctly applied Texas law because the evidence at the temporary injunction hearing was sufficient to conclude that Oklahoma did not have a more significant relationship to the parties and transaction, and that Oklahoma did not have a materially greater interest in the outcome of the dispute.

Appellants also challenge the District Court's order denying their motion to compel arbitration and their motion for reconsideration of that order. Appellants did not attach the arbitration agreement to their motion to compel arbitration or admit it into evidence during the hearing on the motion. A trial court cannot abuse its discretion denying a motion to compel arbitration when the movant has not presented the court with the entire arbitration agreement. Appellants' motion for reconsideration appears to be an attempt to cure their failure to present the arbitration agreement to the District Court, but this Court lacks jurisdiction to review an interlocutory order denying a motion for reconsideration.

# VI.  ARGUMENT

## A. The District Court properly entered a temporary injunction against Appellees

### 1.  Standard of review

The decision to grant a temporary injunction lies within the sound discretion of the district court. *EMS USA, Inc. v. Shary*, 309 S.W.3d 653, 657 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The appellate court draws all legitimate inferences from the evidence in the light most favorable to the trial court's decision. *Id*. As long as some evidence to support the district court's decision, the district court has not abused its discretion. *Id*. Moreover, in the absence of findings of fact or conclusions of law, the appellate court upholds the decision to grant a temporary injunction on any legal theory supported by the record. *Id*.

In reviewing the District Court's temporary injunction, this Court does not address the ultimate question of whether Parker and Myers' restrictive covenant agreements are enforceable. *Id*. at 658. Instead, the issue is whether the District Court erred in concluding that Schlumberger established (1) a cause of action against Appellants, (2) a probable right to relief, and (3) a probable, imminent, and irreparable injury in the interim. *Butnuru v. Ford Motor Co.*, 8 S.W.3d 198, 204 (Tex. 2002). As explained below, the District Court's finding that Schlumberger satisfied these three elements is fully supported by the record.

A restrictive covenant agreement is enforceable if it (1) is "ancillary to or part of an otherwise enforceable agreement," and (2) contains reasonable limitations as to time, geographical area, and scope of activity. Tex. Bus. & Comm. Code § 15.50(a). If a restrictive covenant satisfies the first prong of Section 15.50(a), but contains overbroad limitations as to time, geographical area, or scope of activity, the court must reform the limitations and enforce the restrictive covenant as reformed. *Id*. § 15.51(c).

Appellants do not dispute that the ICN Agreements and Myers' Retention Bonus Agreement meet the first prong of Section 15.50(a). Nor do Appellants dispute that they breached the ICN Agreements and Retention Bonus Agreement. Accordingly, Schlumberger will focus on the arguments raised by Appellants related to the second prong of Section 15.50(a).

2. <u>The temporary injunction does not contain an "industry wide" exclusion</u>

The District Court did not abuse its discretion in crafting the temporary injunction's limitations regarding scope of activity. The temporary injunction restricts Parker and Myers from working for "wireline, slick line, or braided line" operations. Appellants claim that this amounts to an "industry-wide" exclusion. They fail, however, to point to any evidence in the record demonstrating how the temporary injunction prevents them from earning a living in another segment of the oilfield services industry, in the oil and gas industry in

general, or in a different industry altogether. The Fourteenth Court of Appeals has rejected an argument similar to Appellants' and reasoned that an oil and gas industry employee was not faced with an "industry wide" exclusion where he was only restricted from working in a particular segment of the oil and gas industry. *See Curtis v. Ziff Energy Group, Ltd*., 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (agreement that restricted employee from working for "oil and gas consulting firms" contained reasonable limitation as to scope of activity). Similarly, here, because the temporary injunction is limited to a segment of the oil and gas industry, it does not amount to an industry-wide restriction.

Moreover, Appellants fail to inform this Court of undisputed evidence proving that the restrictions contained in the temporary injunction do not prevent—and are not preventing—Appellants from making a living. Witnesses testified at the temporary injunction hearing that Parker owns and operates a composite coiled tubing business, that Parker's composite coiled tubing business does not compete with Schlumberger, and that Schlumberger was not seeking to restrict Parker or Myers from working in composite coiled tubing. (2 R.R. 48-49.) Thus, not only could Parker and Myers work in composite coiled tubing or a variety of other jobs in the oilfield services industry under the terms of the temporary injunction, but Parker (and presumably Myers) already are working in the composite coiled tubing

business.  The temporary injunction does not contain an "industry-wide" exclusion because it is limited to the wireline, slick line, and braided line business.

3. <u>The temporary injunction only restricts Appellants from working in wireline, slick line, and braided line operations</u>

Appellants also advance a hypothetical argument that the temporary injunction would restrict them from working as a janitor for a wireline, slick line, and braided line business.  Appellants, however, offered no evidence at the temporary injunction hearing that wireline, slick line, and braided line companies employ janitors or anyone else outside of an operations role.  In short, the record does not support Appellants' academic theory.

Moreover, even if wireline, slick line, and braided line companies employed janitors, the terms of the temporary injunction would not prevent Appellants from working as janitors.  The temporary injunction only restricts Appellants from working in "wireline, slick line, or braided line operations." Thus, the temporary injunction prevents Appellants from working in operations roles like they have for PWL, but not hypothetical janitor jobs that are not part of a company's wireline, slick line, or braided line operations.

4. <u>The temporary injunction contains reasonable geographic limitations</u>

As a general rule, a geographic restriction is reasonable if it is tailored to the territory in which the employee worked during his employment. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ).  The

reasonableness of a geographical restriction ultimately depends on the nature and extent of the employer's business, and the degree of the employee's involvement in that business. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.). When the employee is a manager, a geographic limitation is reasonable if it covers the territories over which the employee had responsibility. *Id.* at 794 (upholding a reformed non-compete covenant that prohibited a former manager from working in those counties where he previously oversaw operations); *see also M-I LLC v. Lee*, 733 F. Supp. 2d 759, 798 (S.D. Tex. 2010) ("Covenants with wide geographic areas have been upheld frequently in Texas courts, especially when the area covered constitutes the employee's actual sales or work territory.").

Here, the District Court's temporary injunction restricts Parker and Myers from competing in specific counties in Texas, Oklahoma, Louisiana, Arkansas, Pennsylvania, Ohio, West Virginia, and New York. The evidence demonstrated that the business that Parker and Myers managed had operations at well sites in these counties, and that as the managers in charge of Schlumberger's wireline, slick line, and braided line business, they supervised the Schlumberger crews at these well sites. (4 R.R. 72; 5 R.R. Ex. 74.) There was also additional testimony, separate from Exhibit 74, that Parker and Myers had responsibilities over operations in Texas, Oklahoma, Louisiana, Arkansas, and Pennsylvania. (2

R.R. 49, 51; 3 R.R. 25, 52-53.) As the managers in charge of the business, Parker and Myers were "the face of Schlumberger" to the customers in the locations where their crews worked. (2 R.R. 25.) Appellants, who did not appear to testify at the temporary injunction hearing, did not rebut the evidence regarding the geographical scope of their work and responsibilities. Because the temporary injunction's geographic limitation was tailored to the evidence describing the geographical scope of Parker and Myers' responsibilities, the District Court did not abuse its discretion.[3]

Finally, Appellants failed to specify for the District Court any grounds for why the geographical scope of the temporary injunction was overbroad and have not preserved the argument on appeal. Tex. R. App. P. 33.1(a).

5. The temporary injunction contains reasonable customer restrictions

The temporary injunction enjoins Parker and Myers from soliciting or accepting wireline, slick line or braided line work and/or services from specific Schlumberger customers in six states. The list of restricted customers is based on Mike Yarborough's testimony and Exhibit 13. Yarborough testified that, as Parker and Myers' direct supervisor, he was familiar with the customer base for the

---

[3] To the extent that Appellants challenge the temporary injunction's geographical restrictions regarding solicitation of specific customers, such a challenge is without merit. A customer restriction is a reasonable (and enforceable) alternative to a geographical limitation, meaning that no geographical limitation is required for a customer non-solicitation restriction. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)

business that Parker and Myers ran, and that Exhibit 13 was a list he prepared identifying that customer base. (3 R.R. 114.)

Contrary to Appellants' position, Exhibit 13 is not hearsay. "'Hearsay' is a statement, *other than one made by the declarant while testifying at the trial or hearing*, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d) (emphasis added). Yarborough, based on his personal knowledge, testified at the hearing that customer base of the business Parker and Myers ran were those customers listed in Exhibit 13. Thus, the "statement" at issue—the identity of the customers of the business that Parker and Myers ran—was "made by the declarant while testifying at trial" and is not hearsay. Tex. R. Evid. 801(d).

Appellants also claim that the District Court erred because Schlumberger did not offer evidence that Parker and Myers had individual dealings with each of the customers listed in Exhibit 13. At the temporary injunction stage, however, Schlumberger's only needed to establish a probable right to relief on the merits. The evidence showed that (1) Parker and Myers managed the business that provided wireline, slick line, and braided line services to customers, (2) as the managers in charge of the business, Parker and Myers were "the face of Schlumberger" to the customers, and (3) that they were responsible for maintaining Schlumberger's relationships with its customers and "pivotal" in protecting

Schlumberger's customer goodwill. (2 R.R. 15-16, 19, 25.) Appellants offered no evidence indicating that they did not have contact with the customers of the business they ran for Schlumberger. Viewing the evidence in a light most favorable to the District Court's decision, Schlumberger established a probable right to restrain Parker and Myers from soliciting the customers of the business unit they ran for Schlumberger. *See Vaughn v. Intrepid Directional Drilling Specialists, Ltd.*, 288 S.W.3d 931, 937-38 (Tex. App.—Eastland 2009, no pet.) (affirming temporary injunction against oilfield service salesman that restricted him from soliciting all of his former employer's customers in five states).

Finally, Appellants' complaints about the customer restrictions are pointless given that Appellants are subject to broader non-compete restrictions. Parker and Myers have non-compete agreements with Schlumberger that prohibit them from competing with Schlumberger in the wireline, slick line, and braided line segment. As part of enforcing the non-compete restrictions, the District Court could have taken a "belts and suspenders" approach and restrained Appellants from soliciting *any and all* customers for wireline, slick line, and braided line work within the specified geographical area, *regardless of whether Appellants had dealings with those customers*. In other words, if Parker and Myers are barred from working for a competitor in the wireline, slick line, and braided line segment, they are necessarily prohibited from soliciting or accepting wireline, slick line, and

braided line work from customers.  Accordingly, Appellants' complaints about the customer restrictions are futile.

6.  <u>The temporary injunction contains reasonable time limitations</u>

The ICN Agreements and Myers' Retention Bonus Agreement contain one-year restrictive covenants.  (5 R.R. Exs. 1-3.)  Texas courts regularly hold that a one-year time limitation is reasonable and Appellants do not contend that the one-year time limitation is unreasonable.  Instead, Appellants complain that the temporary injunction enforces the restrictive covenants until the March 17, 2015 trial setting.

Myers resigned on September 16, 2014 and, accordingly, he is subject to the restrictive covenants in the ICN Agreement and Retention Bonus Agreement until September 16, 2015.  (5 R.R. Exs. 2, 3, 17.)  The temporary injunction order, on its face, is not "open-ended" as Appellants contend, but restricts Myers' competitive activities until the March 17, 2015 trial setting, which is well before the one-year periods in his agreements expire.  Additionally, it was Myers—not the District Court—who sought to have the trial setting delayed by asking this Court to stay the underlying proceeding and have the trial setting continued.  Finally, Myers made no complaint to the District Judge about the temporal restriction based on the trial date as opposed to another date (or even generally about the reasonableness of the one-year limitation in his agreements), and therefore he may not raise this

complaint on appeal. Tex. R. App. P. 33(a). Because the temporary injunction order does not exceed the reasonable one-year limitation in Myers' restrictive covenants, the District Court did not abuse its discretion.

Parker resigned in October 2013 and his ICN Agreement requires an extension beyond the one-year restriction to compensate for any period in which he was in breach of the agreement. (2 R.R. 16; 5 R.R. Ex. 1 ¶ 7.) The record is replete with evidence that Parker owned and worked for PWL beginning as early as December 2013, which would extend Parker's ICN Agreement for ten months. (3 R.R. 35, 41, 46-49, 103, 106-09.) Moreover, given Parker's $2 million expenditure in December 2013 or January 2014, and giving deference to the District Court's evaluation of the witnesses' credibility (or lack thereof), there is sufficient evidence to conclude that Parker solicited Myers in violation of the ICN Agreement before he invested $2 million in the start-up company. (3 R.R. 46.) The evidence demonstrating Myers' involvement with PWL business activities while still on Schlumberger's payroll, as early as April 2014, only bolsters the inference that Parker solicited Myers early on. (3 R.R. 35, 41, 103, 106-09, 112.)

Parker relies on *Abetter Trucking Co. v. Arizpe* for the proposition that he was permitted to "prepare to compete" during the one-year period of the ICN Agreement. The employee in *Abetter Trucking*, however, did not have a non-compete agreement; instead, the opinion addressed whether the employee violated

his common law fiduciary duty by preparing to compete with his employer during the employment relationship. 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The "preparing to compete" common law principles upon which Parker relies do not apply when the employee and his employer have entered a restrictive covenant agreement. *Ameripath, Inc. v. Hebert*, 447 S.W.3d 319, 341 n.22 (Tex. App.—Dallas 2014, pet. filed). Indeed, *Abetter Trucking* expressly stated that an employer who wished to restrict an employee's competitive activities beyond what the common law prohibited "may seek to accomplish that goal through a non-competition agreement." 113 S.W.3d at 510.

By signing the ICN Agreement, Parker agreed that he would not "directly or indirectly work for or assist" a competing wireline, slick line, or braided line business. The evidence established that PWL is a competitor of Schlumberger's in the wireline, slick line, and braided line segment, and that Parker worked for PWL as early as December 2013. (3 R.R. 32, 46.) Viewing the facts in a light most favorable to the District Court's decision, Schlumberger established a probable right to relief to have Parker's ICN Agreement extended until the March 17, 2015 trial setting in the temporary injunction order.

Schlumberger met its burden to establish a probable right to relief on the merits, and the District Court tailored the temporary injunction to contain

limitations as to time, geographic scope, and scope of activity that are both reasonable and supported by the record.

7.  Schlumberger offered evidence of irreparable harm

Appellants also claim there is no evidence that Schlumberger will suffer irreparable harm in the absence of the temporary injunction. Appellants, however, did not raise the alleged absence of irreparable harm evidence to the District Court. Accordingly, this complaint is waived. Tex. R. App. P. 33.1(a).

Even if Appellants had not waived this complaint, "[i]n Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury." *Am. Express Fin. Advisors v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996). An employee's breach of a restrictive covenant agreement is *prima facie* evidence of an irreparable injury. *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.); *Unitel Corp. v. Decker*, 731 S.W.2d 636, 641 (Tex. App.—Houston [14th Dist.] 1987, no writ). The evidence at the temporary injunction hearing demonstrated that Parker and Myers breached their restrictive covenants (which Appellants do not dispute on appeal) and therefore Schlumberger established a presumption of irreparable harm. *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d at 294.

Additionally, even absent the presumption of irreparable harm, Schlumberger offered evidence upon which the District Court could have

concluded that Schlumberger established irreparable harm. As a result of Parker and Myers' breaches, Schlumberger lost business to PWL and faced the possible loss of customers. (2 R.R. 56; 4 R.R. 96.) At the temporary injunction hearing, Schlumberger witnesses expressed uncertainty about whether additional customers would move their business to PWL absent a temporary injunction and whether Schlumberger would be able to repair the damage already done to its customer relationships. (4 R.R. 96) This evidence is sufficient to demonstrate irreparable harm. *See Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009) (holding that the "possible loss customers is sufficient to establish irreparable harm.").

Moreover, Parker and Myers' solicitation of Schlumberger employees decimated the business that Schlumberger purchased from Parker and caused irreparable harm. (3 R.R. 81.) In fact, Schlumberger had serious concerns that it would not be able to keep the business running. (*Id*.) Had Parker and Myers' recruitment efforts in violation of their restrictive covenant agreements continued, Schlumberger very likely would have been forced to close the business. (3 R.R. 86.) Additionally, Parker and Myers poached highly trained senior employees with about 100 years of combined service and it will take an estimated three years to rebuild the business to the level it was before Parker and Myers' recruited away

Schlumberger's workforce. (4 R.R. 75.) This is clear evidence of irreparable harm.

Appellants have waived any complaint about irreparable harm. Alternatively, viewing the evidence in a light most favorable to the District Court's order, Schlumberger demonstrated that it would suffer irreparable harm unless the District Court maintained the *status quo* until a trial on the merits.

## B. The District Court properly applied Texas law

### 1. Standard of review

Texas follows Section 187(2) of the Restatement (Second) of Conflict of Laws to resolve choice of law questions. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990). Parker and Myers agreed to Texas choice of law provisions (and promised not to contest the provisions in any future legal proceedings). (5 R.R. Ex. 1 ¶ 17; Ex. 2 ¶ 17; Ex. 3 ¶ 11.) Under Section 187(2), the parties' Texas choice of law provision controls unless:

- Oklahoma has a more significant relationship than Texas to the transaction and the parties, *and*

- Oklahoma has a materially greater interest in the determination of the issue, *and*

- Texas law would be contrary to a fundamental policy of Oklahoma.

*Restatement (Second) of Conflict of Laws* § 187(2).

2. <u>The application of Texas law is not contrary to a fundamental policy of Oklahoma</u>

While it is unclear what element or elements of Section 187(2) the District Court found insufficient for Appellants to overcome the Texas choice of law provision at the temporary injunction stage, there is evidence to support the determination that the application of Texas law would not be contrary to a fundamental public policy of Oklahoma.

The application of Texas law is not contrary to a fundamental policy of Oklahoma because the laws governing the enforceability of the agreements at issue are not materially different under Texas or Oklahoma law. Section 218 of the Oklahoma Contracts Code allows non-compete agreements in the context of a sale of a business where, as here, the buyer purchases the goodwill of a business. Okla. Stat. tit. 15 § 218; *Eakle v. Grinnell Corp.*, 272 F. Supp. 2d 1304, 1310 (E.D. Okla. 2003). "[T]he purpose of this statute is to allow the parties to the transfer of a going business to mutually agree, as part of the value of the business transferred, that the transferee will be protected from his transferor who might use his previously acquired experience, contacts and expertise to promote his own interests in the same field of business in competition with his transferee." *Farren v. Autoviable Serv., Inc.*, 508 P.2d 646, 648 (Okla. 1973).

To fall under Section 218 of the Oklahoma Contracts Code, the non-compete covenant does not have to be contained in the actual purchase agreement,

but can be made contemporaneous to the purchase agreement. *Eakle*, 272 F. Supp. 2d at 1311; *Oliver v. Omnicare, Inc.*, 103 P.3d 626, 629 (Okla. Ct. App. 2004). Moreover, the buyer can bind not only the seller to a non-compete agreement, but also key employees of the seller who ran the business and developed the goodwill that the buyer purchased. *Oliver*, 103 P.3d at 629-30.

There was evidence before the District Court to establish that Parker and Myers' restrictive covenants fell under Section 218 of the Oklahoma Contracts Code. Parker sold his business in a transaction that attributed $15,000,000 of the $17,000,000 purchase price to goodwill. (2 R.R. 15, 18, 26.) As part of the transaction, Schlumberger required Parker to sign the ICN Agreement containing a covenant not to compete. (2 R.R. 20.) Because the public policy of Oklahoma authorizes non-compete agreements in the context of the sale of goodwill, the application of Texas law to Parker's ICN Agreement is not contrary to a fundamental policy of Oklahoma. *Eakle*, 272 F. Supp. 2d at 1312 (application of Delaware law to a non-compete agreement that was signed contemporaneous to the sale of business was not contrary to Oklahoma fundamental policy because "the public policy of Oklahoma authorizes non-compete agreements in the context of the sale of goodwill.").

With respect to Myers, he was required to sign the ICN Agreement and Retention Bonus Agreement as part of the transaction involving the sale of

$15,000,000 in goodwill. (2 R.R. 19, 26.) Myers' was instrumental in operating Parker Energy and developing the goodwill that was sold to Schlumberger. (2 R.R. 19.) He was the key customer-relationship employee at Parker Energy, and at the time of the transaction Schlumberger viewed him as the "number one person" vital to maintaining continuity in customer relationships and keeping employee morale high. (*Id.*) Schlumberger so highly appraised Myers' contribution and importance to Parker Energy that it paid him $100,000 to restrict his ability to take the goodwill that Schlumberger purchased by going to work for a competitor. (2 R.R. 19, 28.) Because the public policy of Oklahoma authorizes non-compete agreements with key employees in the context of the sale of goodwill, the application of Texas law to Myers' ICN Agreement and Retention Bonus Agreement is not contrary to a fundamental policy of Oklahoma. *Eakle*, 272 F. Supp. 2d at 1312.[4]

On appeal, Appellants have waived any argument that their agreements are not covered by Section 218 of the Oklahoma Contracts Code. Prior to the temporary injunction hearing, Schlumberger raised the critical impact of Section 218 on the District Court's choice of law analysis (*see* C.R. 207-08), but Appellants provided the District Court no grounds for why Oklahoma would

---

[4] Nor would the enforcement of employee or customer non-solicitation covenants be contrary to Oklahoma public policy. Oklahoma does not consider employee or customer non-solicitation agreements to be restraints on trade or against public policy. Okla. Stat. tit. 15 §§ 219A(A), 219B; *Pre-Paid Legal Servs., Inc. v. Cahill*, 924 F. Supp. 2d 1281, 1290 (E.D. Okla. 2013).

exclude Appellants' agreements from Section 218. As a result, Appellants cannot argue on appeal that their agreements fall outside the scope of Section 218. Tex. R. App. P. 33.1(a).

Finally, contrary to Appellants' position, Oklahoma law, like Texas law, permits courts to modify the restrictions as to time, geographic scope, or scope of activity to be restricted. *Eakle*, 272 F. Supp. 2d at 1311. The Oklahoma Supreme Court specifically recognized that "[j]udicial modifications of contracts falling within the goodwill exception [§ 218, discussed *supra*] has long been the norm." *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1173 n.11 (Okla. 1989). Thus, the procedure of contract reformation is not contrary to a fundamental policy of Oklahoma because Oklahoma also allows this practice.

While Appellants do not point to any differences between Texas law and Oklahoma law regarding whether a limitation as to time, scope of activity, or geographical scope is reasonable, any variations that might exist are not a basis for applying Oklahoma law. *Eakle*, 272 F. Supp. 2d at 1312. The Court in *Eakle* addressed this very issue. The parties entered a non-compete agreement with a Delaware choice of law provision contemporaneous to the sale of a business. *Id.* at 1306. The defendant argued that the application of Delaware law would be contrary to Oklahoma public policy, citing differences between Delaware law and

Oklahoma law about what constituted a reasonable geographic limitation in a non-compete agreement. *Id*. at 1312. The Court, however, disagreed:

> The mere fact a chosen law differs from the forum's law does not make the application of the chosen law a violation of the forum's public policy. Rather, a broader concept of public policy is required. Here, the public policy of Oklahoma authorizes non-compete agreements in the context of the sale of goodwill. While it is true that certain limitations have been enacted under section 218 to govern these situations, the fact remains that Oklahoma nonetheless approves of the concept of non-compete agreements when the sale of goodwill is involved, albeit with certain geographic restrictions. The court concludes such restrictions do not act as an impediment to its application of Delaware law in connection with the [non-compete agreement].

*Id*.

Here, the evidence before the District Court was sufficient to conclude that the agreements at issue were made in connection with the sale of $15,000,000 in goodwill. Appellants did not appear at the temporary injunction hearing to rebut this evidence, nor can they now claim on appeal that their agreements fall outside of Section 218 of the Oklahoma Contracts Code. Because Oklahoma authorizes non-compete agreements in this context, the District Court could have concluded that applying the Texas choice of law provisions was not contrary to Oklahoma fundamental policy.

3. <u>Oklahoma does not have a more significant relationship than Texas</u>

The District Court could have also concluded that Appellants did not demonstrate that Oklahoma has a more significant relationship to the parties and

transaction.  To determine whether Oklahoma has a more significant relationship, several factors should be considered:  (1) the place of contracting, (2) the place of negotiation of the agreements, (3) the place of performance, (4) the location of the subject matter of the contract, (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties, (6) the needs of the interstate and international systems, (7) the relevant policies of the forum, (8) the relevant policies of other interested states and their relative interests in the particular issue, (9) the protection of justified expectations, (10) the basic policies underlying the particular field of law, (11) certainty, predictability, and uniformity of result, and (12) the ease in the determination and application of the law to be applied.  *Ennis, Inc. v. Dunbrooke Apparel Corp.*, 427 S.W.3d 527, 530 (Tex. App.—Dallas 2014, no pet.).

As for the place of contracting and negotiations, Appellants offered no evidence that contracting or negotiations of the ICN Agreements and Retention Bonus Agreement occurred in Oklahoma.  The evidence did show that Parker negotiated the Asset Purchase Agreement ("APA") (which states that Parker and Myers must sign the ICN Agreements and Retention Bonus Agreement) in Oklahoma and that he signed the APA in Texas.  (3 R.R. 54-55.)  Accordingly, the factors regarding the place of contracting and negotiations are split between Texas and Oklahoma.

As for place of performance, and the location and subject matter of the contracts, there are multiple states at issue. During their employment with Schlumberger, Appellants had an office in Oklahoma and did more than half of their work in Oklahoma, but they also worked in Texas, Arkansas, Louisiana, and other states. (3 R.R. 25.) Appellants now work for PWL, an Arkansas company doing business in Texas, Oklahoma, and Arkansas. (3 R.R. 53-54.)[5] Thus, there are several states where Appellants worked for Schlumberger, and three states (Texas, Oklahoma, and Arkansas) where Appellants worked for both Schlumberger and their new employer, PWL. This factor slightly favors Oklahoma, but Texas is certainly in the mix.

As for domicile and residence, three states are at issue. Schlumberger is domiciled in Texas. (C.R. 7.) Parker is a resident of Arkansas. (*Id.*) Myers is a resident of Oklahoma. (*Id.*) This factor does not demonstrate that Oklahoma has a more significant relationship to the parties or transaction.

The next six factors overwhelmingly favor Texas. The Texas Supreme Court, in a very recent choice of law decision, emphasized that the policy of Texas in the twenty-first century is to provide multistate and multinational corporations like Schlumberger the ability "to maintain uniformity in its employment contracts across all employees, whether the individual employees

---

[5] Appellants' brief (at page 29) claims that "Oklahoma is the only state where P.W.L. has performed any wireline operations." The record pages cited by Appellants do not support the statement and Schlumberger offered testimony from Parker's deposition where he admitted that PWL had already done work in Texas. (3. R.R. 53-54.)

reside in Texas or New York. This prevents the 'disruption of orderly employer-employee relations' within those multistate companies and avoids disruption to 'competition in the marketplace.'" *Exxon Mobil Corp. v. Drennen*, --- S.W.3d ----, 2014 Tex. Lexis 760, at *24 (Tex. Aug. 29, 2014). The Texas Supreme Court continued:

> The drafters of the Restatement explained the rationale for section 187 by stating that "[p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities." In multistate transactions, these prime objectives "may best be attained . . . by letting the parties choose the law to govern the validity of the contract."
>
> *          *          *
>
> Uniformity is a frequent goal of contracting, as recognized in the comments to the Restatement section 187, and parties should be able to achieve that goal by choosing the applicable law.

*Id.* at *24-25 (quoting *Restatement (Second) of Conflict of Laws* § 187 cmt. e; internal citations omitted).

Here, with respect to the remaining factors to be considered, the application of Texas law facilitates "the needs of the interstate and international systems" by providing uniformity and predictability for Schlumberger and its multistate workforce. "[T]he relevant policies of the forum," which the Texas Supreme Court recently announced was allowing multistate corporations "to maintain uniformity in its employment contracts across all employees," also

strongly favors the application of Texas law. *Exxon Mobil Corp. v. Drennen*, --- S.W.3d ----, 2014 Tex. Lexis 760, at \*24. Finally, the application of Texas law ensures "the protection of justified expectations" and provides "certainty, predictability, and uniformity of result."

All of these remaining factors point to Texas as having a more significant relationship to the parties and transaction. Appellants did not make any argument to the District Court regarding these remaining factors or how they favored Oklahoma (*see* C.R. 186-192), and have waived any argument on these factors on appeal. Tex. R. App. P. 33.1(a). Overall, considering the many relevant factors, there is some evidence supporting the District Court's decision that Appellants did not prove that Oklahoma has a more significant relationship.

4. <u>Oklahoma does not have a materially greater interest in the determination of the issue</u>

There was also evidence supporting the District Court's conclusion that Appellants did not prove that Oklahoma has a "materially greater interest" in determining the enforceability of the ICN Agreements and Myers' Retention Bonus Agreement. As explained above, Oklahoma does not even have a "more significant" relationship to the parties and the transaction. It follows then that Oklahoma does not have a "materially greater interest" in the enforceability of the agreements at issue.

Most significantly, Parker and Myers are doing work for PWL in Texas (3 R.R. 53.), and Texas clearly has a significant interest in the enforceability of restrictive covenant agreements between a Texas corporation and its former employees who worked for the corporation in Texas and are now attempting to compete with the corporation in Texas. Beyond the facts already discussed in the preceding section, it is also worth noting that Parker and Myers had significant contacts with Texas when forming PWL. PWL registered to do business in Texas in July 2014. (5 R.R. Ex. 66.) Parker purchased equipment and insurance for PWL in Texas. (3 R.R. 48, 56, 72.) Several of the customers at issue are Texas-based companies and PWL agreed to Texas choice of law provisions in its contracts with those customers. (4 R.R. 99-100.) Finally, as emphasized by the Texas Supreme Court in *Drennen*, Texas has a substantial interest in providing predictability, certainty, and uniformity for employment agreements between a multistate employer headquartered in Texas and its employees.

It was proper for the District Court to conclude that Appellants' choice of law argument failed at any of the three obstacles they faced under Section 187(2) of the *Restatement*. Because Oklahoma law authorizes non-compete agreements in the context of a sale of a business (and because Appellants waived any argument that their agreements fell outside of Section 218 of the Oklahoma Contracts Code), the application of Texas law is not contrary to an

Oklahoma fundamental policy. Additionally, given the number of connections between Texas, the restrictive covenant agreements, and the parties, and viewing the evidence in a light most favorable to the District Court's decision, the District Court could have concluded that Oklahoma does not have a more significant relationship to the parties and transaction, or a materially greater interest in this lawsuit. For any of these reasons, the District Court did not err when applying Texas law at the temporary injunction stage.

## C. This Court lacks jurisdiction to review the District Court's denial of Appellants' motion for reconsideration

Appellants' appeal of the District Court's order denying their motion for reconsideration should be dismissed for lack of jurisdiction. Texas courts strictly construe statutes permitting interlocutory appeals because they are narrow exceptions to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez*, 340 S.W.3d 444, 447-48 (Tex. 2011). Section 51.016 of the Texas Civil Practice and Remedies Code provides that, in a matter subject to the Federal Arbitration Act ("FAA"), a party may take an interlocutory appeal under the same circumstances that an appeal is permitted under federal law. Tex. Civ. Prac. & Rem. Code § 51.016.[6] Section 16 of the FAA permits interlocutory appeals from orders denying motions to compel arbitration, but not orders denying a motion for reconsideration. 9 U.S.C. § 16; *see also Nazareth*

---

[6] The arbitration provision upon which Appellants rely refers to the FAA. (C.R. 219.)

*Hall Nursing Ctr. v. Castro*, 374 S.W.3d 590, 594 (Tex. App.—El Paso 2012, no pet.) ("The relevant provisions of the FAA setting forth when an interlocutory appeal is permitted refer only to orders denying an application to compel arbitration and not to motion to reconsider."). Because Texas courts strictly construe statutes authorizing interlocutory appeals, and because Section 16 of the FAA excludes orders denying a motion for reconsideration, "Texas courts have found that an appeal from a trial court's order denying a motion to reconsider is not permitted under Section 51.016 of the Texas Civil Practice and Remedies Code and Section 16 of the FAA." *Nazareth Hall*, 374 S.W.3d at 593 (collecting cases); *cf. Digges v. Knowledge Alliance, Inc.*, 176 S.W.3d 463, 464 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that motion to reconsider special appearance was not independently appealable; statute only authorized appeal from order granting or denying special appearance). Accordingly, this Court lacks jurisdiction to review the District Court's denial of Appellants' motion for reconsideration.

## D. The District Court properly denied Appellants' motion to compel arbitration

### 1. Standard of review

The District Court correctly concluded that Schlumberger has not asserted any claims based on the APA in the underlying lawsuit and rejected Appellants' contention that the APA's arbitration provision requires all of Schlumberger's claims to be sent to arbitration. An order denying a motion to

compel is reviewed for an abuse of discretion. *Speedemissions, Inc. v. Bear Gate, LP*, 404 S.W.3d 34, 41 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Appellate courts defer to the trial court's factual determinations if they are supported by the record and review questions of law *de novo*. *Id*.

A party seeking to compel arbitration must first establish that valid arbitration agreement exists. *Osornia v. Amerimex Motor & Controls, Inc.*, 367 S.W.3d 707, 711 (Tex. App.—Houston [14th Dist.] 2012, no pet.). If a valid arbitration agreement exists between the parties, a party seeking to compel arbitration must then establish that the claims at issue are within the scope of the arbitration agreement. *Id*. Although there is a presumption in favor of arbitration, that presumption arises only after the party seeking to compel arbitration proves a valid arbitration agreement exists. *Speedemissions, Inc.*, 404 S.W.3d at 41.

2. Appellants did not present the entire APA to the District Court

The District Court's decision to deny Appellants' motion to compel arbitration must be affirmed if there is any legal theory supporting it. *Wetzel v. Sullivan, King & Sabom, P.C.*, 745 S.W.2d 78, 81 (Tex. App.—Houston [1st Dist.] 1988, no writ). When Appellants moved to compel arbitration, they did not attach the APA to their motion. (C.R. 160-184.) Their motion for reconsideration appears to be an attempt to cure this defect. (4 R.R. 5-7; C.R. 277.) When the District Court heard Appellants' motion to compel arbitration, only the few pages

of the APA attached to Schlumberger's response were before the District Court. (*See* C.R. 218-220.)

Appellants' failure to present the District Court with the entire APA is fatal to their appeal. A district court does not abuse its discretion denying a motion to compel arbitration when the entire agreement with the arbitration provision is not before it. *The Branch Law Firm, LLP v. Osborn*, 447 S.W.3d 390, 396-98 (Tex. App.—Houston [14th Dist.] 2014, no pet. h.) (affirming denial of motion to compel arbitration because entire agreement was not before trial court). Because the District Court's decision to deny Appellants' motion to compel arbitration can be upheld on the basis that Appellants did not attach the entire APA to their motion to compel, the District Court's order must be affirmed.

3. There is no arbitration agreement between Schlumberger and Myers

The District Court also properly refused to send Schlumberger's claims against Myers to arbitration because Myers is not a signatory to the APA. As a general rule, a non-signatory to an arbitration agreement cannot compel a signatory to arbitrate. *VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 830 (Tex. App.—Dallas 2013, no pet.); *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (the law "does not require parties to arbitrate when they have not agreed to do so"). Myers contends that, although he is not a signatory to the APA, the doctrine of direct benefits estoppel allows him to compel

Schlumberger to arbitration under the APA. The District Court's decision not to apply direct benefits estoppel is reviewed under the abuse of discretion standard. *VSR Fin. Servs., Inc.*, 409 S.W.3d at 830; *see also In re Weekley Homes, LP*, 180 S.W.3d 127, 134-35 (Tex. 2005) (stating that the "equitable nature" of direct benefits estoppel "may render firm standards inappropriate, requiring trial courts to exercise some discretion based on the facts of each case.").

Myers incorrectly contends that Texas recognizes two variations of direct benefits estoppel that allow a non-signatory to compel a signatory to arbitration. The first variation, according to Myers, applies when a signatory to an arbitration agreement sues both a signatory and non-signatory based on "substantially interdependent and concerted misconduct." The Texas Supreme Court, however, has expressly rejected this species of direct benefits estoppel. *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) ("we have never compelled arbitration based solely on substantially interdependent and concerted misconduct, and for several reasons we decline to do so here."); *The Inland Sea, Inc. v. Castro*, 420 S.W.3d 55, 59 (Tex. App.—El Paso 2012, pet. denied) (recognizing that *Merrill Lynch* rejected "concerted misconduct" estoppel).

The second variation of direct benefits estoppel, although a valid theory under Texas law, does not apply to Schlumberger's claims against Myers. Direct benefits estoppel enables a non-signatory to compel arbitration where his

"liability arises solely from the contract or must be determined by reference to it." *Weekley Homes*, 180 S.W.3d at 132; *see also VSR Fin. Servs., Inc.*, 409 S.W.3d at 831. The rationale behind the doctrine is that a signatory claimant cannot "have it both ways," seeking to hold the non-signatory liable based on duties imposed by the agreement with the arbitration provision, on the one hand, and denying the arbitration provision's applicability because the defendant is a non-signatory, on the other hand. *Id*.

Direct benefits estoppel does not apply when the signatory's claims merely "relate to" the contract with the arbitration provision. *Id*. The doctrine is also inapplicable when the benefit is indirect or when the claims are based on duties arising outside of the contract with the arbitration provision. *Id*. Nor does direct benefits estoppel apply "simply because the signatory's claims against the non-signatory 'touch matters' covered by the contract or 'are dependent upon' the contract; instead, the signatory's claims must *rely* on the terms of the contract." *Skyleasing, LLC v. Tejas Acvo, Inc.*, 2006 Tex. App. Lexis 7098, at *15 (Tex. App.—Houston [14th Dist.] Aug. 10, 2006, no pet.) (emphasis in original; quoting *Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 348-49 (5th Cir. 2002)).

Schlumberger is not attempting to hold Myers liable based on duties arising under the APA while at the same time seeking to avoid arbitration. Indeed, Myers has not identified—to the District Court or this Court—what "direct

benefit" from the APA, if any, Schlumberger is seeking to enforce against him in the lawsuit. At most, the APA contemplated that Myers would sign the ICN Agreement and Retention Bonus Agreement. Schlumberger, however, is not claiming that Myers failed to sign the agreements and has not sued him for refusing to sign the agreements.

Schlumberger's claims against Myers are independent of the APA: the claims rely on the express terms of the ICN Agreement and Retention Bonus Agreement, the common law duties Myers owed as an employee of Schlumberger, and Myers' common law duty not to tortiously interfere with Schlumberger's prospective business relations. Moreover, Schlumberger's mere reference to the APA in its petition is not a basis for applying direct benefits estoppel. *VSR Fin. Servs., Inc.*, 409 S.W.3d at 833 (rejecting direct benefits estoppel where signatory's claims against non-signatory referenced contract with arbitration provision, but signatory did not seek to enforce obligations in the contract); *Karlin v. DCP Midstream, LP*, 2013 Tex. App. Lexis 6966, at *8 (Tex. App.—Amarillo June 6, 2013, pet. denied) (although pleadings referenced contract with arbitration provision, rejecting direct benefits estoppel because signatory did not seek to hold non-signatory liable pursuant to the duties imposed by the contract). Because Schlumberger does not seek to enforce the provisions of the APA against Myers, the District Court correctly concluded that direct benefits estoppel is inapplicable.

*Speedemissions, Inc.*, 404 S.W.3d at 48 ("In this suit, neither Speedemissions nor Bear Gate is seeking a direct benefit granted by the Stock Purchase Agreement or relying on a claim or defense under that agreement. Thus, the direct benefits doctrine of estoppel does not apply here."); *Skyleasing, LLC v. Tejas Acvo, Inc.*, 2006 Tex. App. 7098, at *16 (although the signatory's claim would not exist "but for" the contract with the arbitration provision, direct benefits estoppel did not apply because the signatory was not required to prove any terms of the contract in its claim against the non-signatory).[7]

4. <u>The District Court was required to determine the arbitrability of Schlumberger's claims against Myers</u>

Myers also contends that the arbitrator, rather than the district court, was required to determine whether a valid arbitration agreement existed between Schlumberger and Myers. But "[w]hether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). This is the rule, regardless of

---

[7] In addition to the fact that no arbitration agreement exists between Schlumberger and Myers, Schlumberger's claims against Myers fall outside the scope of the APA's arbitration provision. For example, the Retention Bonus Agreement gives the Judicial District Courts of Fort Bend County "exclusive jurisdiction" to settle any disputes relating to the Retention Bonus Agreement. (5 R.R. Ex. 3 ¶ 11.) This express provision cannot be harmonized with the APA and conclusively establishes that the parties did not intend to arbitrate claims relating to the Retention Bonus Agreement.

whether the arbitration agreement at issue contains a reference to AAA Rules allowing the arbitrator to resolve issues of arbitrability. *Elgohary v. Herrera*, 405 S.W.3d 785, 792 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Roe v. Ladymon*, 318 S.W.3d 502, 517 (Tex. App.—Dallas 2010, no pet.). Because Texas law requires the district court—and not the arbitrator—to determine the gateway matter of whether a non-signatory can compel a signatory to arbitration, the District Court properly addressed the issue of arbitrability.

5. The District Court properly concluded that Schlumberger's claims against Parker are outside the scope of the APA

In addition to the fact that Parker did not submit the entire APA to the District Court, Parker's motion to compel arbitration was also properly denied because Schlumberger's claims against him are outside the scope of the APA. Arbitration is a matter of contract between the parties, and a court cannot compel a party to arbitrate a dispute beyond the scope of its arbitration agreement. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). When evaluating whether claims fall within the scope of an arbitration provision, the court's "primary concern is to ascertain and give effect to the intent of the parties as expressed in the contract." *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011).

The ICN Agreement is the only contract upon which Schlumberger has sued Parker. The ICN Agreement does not contain an arbitration provision.

(C.R. 226.) In fact, the parties' intent ***not to arbitrate*** claims under the ICN Agreement is evident from the ICN Agreement. The parties agreed in the ICN Agreement that all disputes relating to the ICN Agreement must be heard exclusively in Fort Bend County. (*Id.*) In contrast, the APA contains a Houston venue provision for both the arbitration and claims for injunctive relief that the APA permits to be brought in court. (C.R. 219.)

In addition to the inconsistent provisions demonstrating that the parties did not intend to arbitrate claims under the ICN Agreement, Schlumberger has not asserted claims against Parker "arising under or in connection with" the APA:

- Schlumberger does not allege that Parker breached the APA;
- Schlumberger's contract claim hinges on the terms of the ICN Agreement and not any term in the APA; and
- Neither Schlumberger nor Parker allege there is any dispute over the interpretation of the APA.

Schlumberger's breach of contract claim can stand alone from the APA and therefore falls outside the scope of the APA's arbitration provision.

With respect to Schlumberger's tort claims, "[a] tort claim is arbitrable if it is so interwoven with the contract [containing the arbitration provision] that it could not stand alone, but it is not arbitrable if it is completely independent of the contract and could be maintained without reference to a

contract." *XL Ins. Co. v. Hartford Accident and Indemnity Co.*, 918 S.W.2d 687, 698 (Tex. App.—Beaumont 1996, pet. dism'd w.o.j.). "In cases ordering arbitration of tort claims, the claims either related directly to the agreement itself or arose from the legal relationship governed by the agreement containing the arbitration clause." *Loy v. Harter*, 128 S.W.3d 397, 404-05 (Tex. App.—Texarkana 2004, pet. denied).

Schlumberger's tort claims against Parker do not meet this standard. Schlumberger's aiding and abetting claim (*i.e.*, that he aided Myers' breach of fiduciary duties before Myers' resignation) does not arise out of or depend on the APA or even Parker's former employment relationship with Schlumberger. The claim exists against third-parties (such as competitors) and can be maintained without reference to the APA. *Mabrey v. Sand Stream, Inc.*, 124 S.W.3d 302, 317 (Tex. App.—Fort Worth 2003, no pet.) (affirming temporary injunction against developer who aided employees in breaching their fiduciary duties to their employer).

Schlumberger's tortious interference claims are also independent of the APA. Parker's duties giving rise to Schlumberger's tortious interference claims are derived from the common law and do not arise under any obligation Parker owed Schlumberger under the APA. Additionally, Schlumberger can maintain these tort claims without any reference to the APA.

Parker's reliance on what he mischaracterizes as a "pre-suit" demand letter is unavailing. Parker misrepresents that the demand letter asserting claims under the APA predated Schlumberger's lawsuit asserting non-APA claims. Schlumberger, however, filed the lawsuit (asserting no claims under the APA) on October 8, 2014 and sent the demand letter raising claims under the APA (*e.g.*, Parker's use of a domain name, tools, and equipment he sold to Schlumberger) on October 29, 2014. (C.R. 7, 180.) The demand letter is entirely consistent with the District Court's view that Schlumberger's claims in the lawsuit are separable from any claims under the APA. (*See* C.R. 180-182.)

Finally, regardless of the applicability of the APA's arbitration provision to Schlumberger's claims against Parker, the District Court had authority to temporarily enjoin Parker and has authority to enter a permanent injunction against Parker. The APA expressly carves out claims for injunctive relief from the arbitration clause. (C.R. 218.) Accordingly, even if the APA requires Schlumberger to arbitrate its damages claims against Parker (which it does not), the APA permits Schlumberger to maintain claims against Parker for injunctive relief in court.

6. <u>The District Court did not err by deciding the arbitrability of Schlumberger's claims against Parker</u>

Like Myers, Parker also claims that the arbitrator had exclusive authority to determine whether Schlumberger's claims were subject to arbitration.

As a general rule, courts, rather than arbitrators, decide matters of substantive arbitrability (*i.e.*, whether an arbitration agreement exists and whether the claims are within the scope of the agreement). *ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 412 (Tex. App.—Houston [1st Dist.] 2008, no pet.). For courts to be divested of their authority to determine issues of arbitrability, the party seeking to compel arbitration must show "clear and unmistakable evidence" that the parties intended to confer exclusive authority on the arbitrator to decide matters of substantive arbitrability. *Id*. at 413.

Parker relies on *Schlumberger Technology Corp. v. Baker Hughes, Inc.* to support his argument that the District Court did not have authority to determine issues of arbitrability. Schlumberger and Baker Hughes were parties to an arbitration agreement and, when a dispute arose over whether a particular claim was arbitrable in the course of the arbitration, the AAA panel decided the issue of arbitrability. 355 S.W.3d 791, 802 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Applying the "clear and unmistakable" standard, this Court noted that the incorporation of AAA Rules that empower an arbitrator to determine arbitrability "has been held to be clear and unmistakable evidence of the parties' intent to allow the arbitrator to decide such issues." *Id*.

Contrary to Parker's position, however, the incorporation of AAA rules is not dispositive. This Court has warned that a "court should not blindly

apply the majority view regarding the effect of mere reference to AAA rules and ignore the 'clear and unmistakable standard' set forth by the Supreme Court." *Burlington Resources Oil & Gas Co., LP v. San Juan Basin Royalty*, 249 S.W.3d 34, 42 (Tex. App.—Houston [1st Dist.] 2007). When evaluating whether there is "clear and unmistakable evidence," courts must ultimately be guided by the "general principles of Texas contract law governing the formation of contract" and the parties' objective intent as expressed in their agreements. *Id*. Even when the arbitration provision incorporates AAA Rules, this Court has refused to find "clear and unmistakable evidence" of the parties' intent to refer all matters of substantive arbitrability to the arbitrator. *See id.*; *ODL Servs., Inc.*, 264 S.W.3d at 415.

Parker failed to offer the District Court "clear and unmistakable evidence" that he and Schlumberger intended to refer the question of arbitrability regarding Schlumberger's claims in this case to an arbitrator. First, Parker did not submit the AAA Rules as evidence and did not ask the District Court to take judicial notice of the AAA Rules. The Dallas Court of Appeals held a party cannot meet the "clear and unmistakable evidence" standard based on the arbitration provision's incorporation of AAA Rules unless the rules are submitted as evidence. *Per Group LP v. Medical Media Holdings, LLC*, 294 S.W.3d 378, 386 (Tex. App.—Dallas 2009, no pet.).

As here, the defendant in *Per Group* argued that, because the arbitration agreement incorporated AAA Rules, the arbitrator must decide whether the asserted claims were subject to an arbitration agreement. *Id*. The Dallas Court of Appeals disagreed:

> Although the motion to compel refers to the AAA rules as an attached exhibit to the motion, the exhibit number does not contain those rules and there is nothing to indicate that the rules were offered into evidence below. ***As a result, we conclude that the trial court was required to determine the scope of the arbitration agreement.***

*Id*. (emphasis added).

The same result is required here: Parker failed to offer the AAA Rules into evidence and consequently fell short of satisfying the "clear and unmistakable evidence" standard. Accordingly, the District Court "was required to determine the scope of the arbitration agreement." *Id*. Because the District Court's decision to address the arbitrability of Schlumberger's claims can be upheld on the basis that Parker did not offer the AAA Rules into evidence, the District Court's order should be affirmed.

Second, Parker cannot satisfy the "clear and unmistakable evidence" standard because the APA does not require *all* claims to be arbitrated, but instead carves out claims for injunctive relief from the arbitration provision. In *Burlington Resources*, 249 S.W.3d at 42, this Court approvingly cited *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006), where the Delaware court evaluated

whether the incorporation of AAA Rules established "clear and unmistakable evidence" of the parties' intent to have the arbitrator determine arbitrability. The Court recognized that the incorporation of AAA Rules does not mandate that arbitrators decide arbitrability in *all* cases, but generally confers that authority upon arbitrators where the arbitration provision requires arbitration of "all disputes." *Id*. at 80. In *James & Jackson*, despite a broad arbitration clause and the incorporation of AAA Rules, the agreement specifically authorized the parties to seek injunctive relief and specific performance in the courts. *Id*. at 81. The Court held:

> Since this arbitration clause does not generally refer all controversies to arbitration, the federal majority rule does not apply, and something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator.

*Id*. The movant, however, did not offer "something other than the incorporation of the AAA rules" to meet its burden, and consequently the Court determined that the trial court had the authority to resolve matters of arbitrability. *Id*.

Here, the APA expressly carves out claims for injunctive relief from the arbitration clause. (C.R. 218.) Specifically, the APA provides that "the obligations of Seller under this Agreement . . . shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection

therewith." (*Id.*) Because the APA does not require all controversies to be submitted to arbitration, the incorporation of AAA Rules, alone, cannot satisfy the "clear and unmistakable evidence" standard. *James & Jackson*, 906 A.2d at 81.[8]

## VII. PRAYER

For the reasons stated above, Schlumberger respectfully requests that the Court affirm the District Court's temporary injunction and order denying Appellants' motion to compel arbitration, and dismiss Appellants' interlocutory appeal of the order denying their motion for reconsideration for lack of jurisdiction.

---

[8] Appellants' argument that Schlumberger is judicially estopped from asserting that the District Court had authority to resolve issues of arbitrability fails for several reasons. First, Appellants did not raise any argument about judicial estoppel to the District Court (*see* C.R. 166-67) and have therefore waived the issue. Second, this case is distinguishable from *Schlumberger Technology Corp. v. Baker Hughes, Inc.* in many respects, including but not limited to: (1) the previous case did not involve non-signatories seeking to compel arbitration, (2) unlike this case, the issue in the previous case was whether an arbitration panel in a pending arbitration had authority to determine issues of arbitrability, (3) the APA permits the parties to seek injunctive relief and specific performance in courts, and (4) the contracts upon which Schlumberger has sued do not contain any arbitration provision, let alone one incorporating AAA Rules.

Respectfully submitted,

*/s/ Jeff Barnes*

Jeff Barnes
State Bar No. 24045452
barnesj@jacksonlewis.com
JACKSON LEWIS P.C.
1415 Louisiana, Suite 3325
Houston, Texas  77002-7332
PH:  (713) 650-0404
FX:  (713) 650-0405

and

William L. Davis, Esq.
State Bar No. 05563800
davisw@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH:  (214) 520-2400
FX:  (214) 520-2008

**ATTORNEYS FOR APPELLEE
SCHLUMBERGER TECHNOLOGY
CORPORATION**

## CERTIFICATE OF COMPLIANCE

I certify that this computer-generated brief contains 14,284 words.

*/s/ Jeff Barnes*
Jeff Barnes

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on counsel for Appellants Ricky Parker and James Myers on February 17, 2015.

*/s/ Jeff Barnes*
Jeff Barnes

4837-0907-5745, v. 5